[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11418

_____

D.C. Docket No. 1:15-cr-20822-KMM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MAX JERI,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 5, 2017)

Before HULL, MARCUS, and CLEVENGER,[*] Circuit Judges.

_____

[*] Honorable Raymond C. Clevenger III, United States Circuit Judge for the Federal Circuit,
sitting by designation.

MARCUS, Circuit Judge:

In October 2015, Max Jeri arrived at Miami International Airport on a flight from Lima, Peru, carrying 7.95 kilograms of cocaine secreted in various items in his luggage including jackets, notebooks, purses, and pillows. Jeri was charged, tried by a jury, and convicted of importing a controlled substance and of possessing a controlled substance with the intent to distribute. On the eve of trial, the Government came into possession of a video filmed for a television show, "Drug Wars," that was filmed at the airport during the seizure of the drugs Jeri was carrying. The film showed the cocaine that had been recovered from Jeri's luggage. Jeri was given a copy of the video on the morning of trial, but his motion to continue the trial was denied and the case proceeded before he had a chance to watch the video.

Jeri now appeals the denial of his motion for a new trial and challenges several of the trial court's rulings. He cites several errors, including that the trial court's denial of a continuance deprived him of his right to counsel; that the court erred by excluding what he characterized as the exculpatory "Drug Wars" video and several transcripts taken from controlled calls and text messages that Jeri placed under the guidance of law enforcement after he was taken into custody; that the trial court limited his ability to cross-examine two Government witnesses; that the trial court improperly allowed a lay witness to testify as an expert, allowed that

2

witness to testify regarding an ultimate issue of the case, and allowed an expert witness to testify about drug-courier profiles; that the trial court erroneously instructed the jury on deliberate ignorance; and, finally, that the cumulative effect of these errors entitles him to a new trial.

After closely reviewing the entire record, we cannot say that the trial court abused its discretion in denying Jeri's motion for a new trial. Although we think it would have been wiser to allow Jeri time to view the video before starting the trial, the tape was not exculpatory and Jeri has not come close to establishing specific and substantial prejudice from this omission. We can discern no other errors in this record, and, therefore, affirm the judgment of the district court.

I.

On October 9, 2015, Max Jeri arrived at Miami International Airport aboard American Airlines Flight #918 from Lima, Peru. Upon his arrival, he headed to passport control. The attending Passport Control Officer, David Saavedra, asked him several standard entry questions and ultimately referred him for secondary screening because his answers appeared to be "very vague," his responses were "very long," he would not make "eye contact," and he was "looking around for answers." According to Saavedra, "it all appeared suspicious." Jeri then entered the country, collected his two checked bags, and proceeded for a customs examination. CBP Officer Claudia Laucerica asked Jeri whether the two items of

3

checked luggage, the carry-on bag, and the duty-free bag he was carrying were his; whether everything belonged to him; whether he had packed everything by himself; and, finally, whether he was transporting anything for anyone else. Jeri answered the first three questions affirmatively and, as for the fourth, explained that he was transporting some souvenirs from his sister and some candies for his children.

Laucerica and CBP Officer Carlos Iguina opened the bags. Immediately, they saw some adult-sized winter jackets and smelled "some odor of perfume." A bottle of perfume was found in his luggage, but the perfume had a different smell than the odor emanating from the jackets. The officers asked Jeri about the perfume and why it smelled so strongly; he "said they probably put perfume on it." The officers also asked Jeri about the jackets, and, notably, he explained that they were for his children in New York. Laucerica ran the jackets through an x-ray machine and saw irregularities that appeared to show small packages concealed inside the jackets. Around the same time, Iguina noticed that Jeri's luggage also contained purses and pillows that felt abnormally thick. The officers cut these items open and found still more small packages inside.

The substances contained within these packages were field tested and indicated a positive result for cocaine. In all, the officers found <u>ten</u> purses, <u>four</u> adult jackets, <u>three</u> children's jackets, <u>several</u> notebooks, <u>three</u> pillows, and <u>two</u>

4

bottles.  All of the purses, jackets, notebooks, and pillows were filled with packages containing powdered cocaine; the bottles contained liquid cocaine.  In all, the officers recovered some 7.95 kilograms of cocaine hydrochloride from Jeri's three bags.  No property receipts or reports indicated which items containing narcotics were taken from which pieces of luggage, but, the officers explained, all of Jeri's bags contained some amount of cocaine.  Laucerica testified that three of the purses containing cocaine were taken from Jeri's carry-on bag.

Jeri was read his Miranda rights in Spanish (he did not speak English); he waived them and agreed to speak to law enforcement.  He told the officers that in his wallet they would find a business card with the name of the person for whom he was transporting the bags.  The business card contained the name Fancy Lopez, one of Jeri's coworkers at a nursing home in New York.  Jeri explained that in September 2015, he approached Lopez, who he knew owned a travel agency, to ask if she had any cheap tickets to Peru.  A few days later, Lopez told him that she would give him a free ticket if he would transport two bags from New York to Peru and then return with two bags from Peru.  After he agreed, Lopez purchased his ticket and gave him the bags to take from New York to Peru; they contained electronic items, toys, and shoes.  When Jeri got to Peru, he met Lopez's sister and gave her the suitcases.  Before he left Peru, he met Lopez's sister again, at the airport; she accompanied him to an American Airlines ticket counter, where she

5

opened the bags and showed him what was inside.  Jeri then checked the bags and boarded the flight to Miami.

Jeri further explained that he had met Lopez some ten years earlier and that he had previously transported bags for Lopez.  In 2014, Lopez gave him a ticket from New York to Peru in exchange for transporting bags to Peru, but Jeri refused to bring bags back to New York.  He said that he had seen drug seizures on the news and on the Discovery Channel and did not feel comfortable transporting bags from Peru to the United States.

The officers asked Jeri why he had lied to them about the jackets, initially asserting that they were for his children.  He claimed he "didn't see anything wrong with it, and he was also trying to move along with the process."  According to Homeland Security Investigation (HSI) Officer Eduardo Escobar, Jeri then "stood there for a while almost trying . . . to think of what to say," before remarking, "I can't believe she did that to me, we have known each other for 10 years."

Hours after the seizure, Jeri volunteered to make several controlled phone calls to Lopez.  The law-enforcement officers coached Jeri on what to say; the goal was to elicit inculpatory comments from Lopez about the contents of the luggage.  Jeri told Lopez he was concerned the bags contained drugs, but she repeatedly said the bags were clean and asked him to continue his trip to New York.  The officers

6

also arranged a controlled delivery of the bags, but the individuals who came to pick them up refused to take possession and left empty-handed.  No arrests were made.

Jeri was then indicted by a federal grand jury in Miami for one count of importing a controlled substance in violation of 21 U.S.C. § 952(a) and one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1).  In various pretrial motions, Jeri objected to the Government's request to exclude transcripts of the controlled calls and text messages and also objected to one of the Government's experts.  These motions were denied.  Jeri also moved for a continuance twice, seeking additional time to review evidence and investigate potential witnesses.  Both motions were denied.

On the eve of trial, the prosecution learned for the first time that a film crew from the television show "Drug Wars" was at Miami International Airport at the time of Jeri's seizure.  The prosecutor informed defense counsel of a video that had been made and said every effort would be made to obtain a copy of the footage. The prosecution received a copy from the show's production company on the evening before trial (December 13); they informed defense counsel at 8:52 p.m. that they had obtained a copy of the video and would make it available.  The video was produced to defense counsel at 8:30 a.m. on the morning of the first day of trial

7

(December 14), but the trial court denied Jeri's request for a continuance or a recess to allow him an opportunity to view the video before the trial started.

The trial began on December 14, 2015, and lasted only a day and a half. And the only question at issue was whether Jeri knew there was cocaine in the luggage he had transported. The Government called six witnesses: CBP Officers Saavedra, Laucerica, and Iguina; HSI Officer Escobar; and two expert witness, Special Agent Marco Suarez and Doraida Diaz (a forensic chemist with the Drug Enforcement Administration). At the end of the first day, the defendant moved for a mistrial because the court had denied his motion for a continuance and because it had admitted expert testimony from Escobar. The next day -- after the defense had an opportunity to view the "Drug Wars" video -- Jeri's counsel offered the video as evidence. The district court denied that application as well as a renewed motion for a mistrial.

Jeri did not call any witnesses or testify on his own behalf. After the Government rested, the defense renewed its previous motions for a mistrial, again without success. The jury received the trial court's instructions -- including an instruction on deliberate ignorance, as requested by the Government -- and left to deliberate at 10:30 a.m. on December 15. The jury finished deliberating at 11:50 a.m. and returned a guilty verdict on both counts.

8

Jeri was sentenced two and a half months later.  The Presentence Investigation Report recommended an offense level of 30 and a criminal-history category of I, yielding a guidelines range of 97 to 121 months.  Jeri was sentenced to 120 months on both counts, to be served concurrently, followed by four years of supervised release.  The defendant unsuccessfully moved for a new trial, and he timely appealed his convictions to this Court.

## II.

Jeri first claims that the district court's denial of his motions to continue violated his right to counsel by impairing his ability to present a defense.  "We review a district court's denial of a motion for continuance only for an abuse of discretion."  United States v. Valladares, 544 F.3d 1257, 1261 (11th Cir. 2008).  "To prevail on such a claim, a defendant must show that the denial of the motion for continuance was an abuse of discretion which resulted in specific substantial prejudice."  United States v. Verderame, 51 F.3d 249, 251 (11th Cir. 1995).  As we see it, while the district court would have been wiser to allow a continuance, we are hard-pressed to say, on this record, that the error was fatal.  Jeri has not come close to showing specific and substantial prejudice because the video revealed the contents of the luggage only after they had been removed from the various bags, and none of the film exculpated Jeri.

9

"The Sixth and Fourteenth Amendments to the U.S. Constitution guarantee that any person brought to trial in any state or federal court must be afforded the right to assistance of counsel before he or she can be validly convicted and punished by imprisonment." Id. And "[i]mplicit in th[e] right to counsel is the notion of adequate time for counsel to prepare the defense." Id. at 252. Thus, under some circumstances, the "denial of a motion for continuance of trial may vitiate the effect of this fundamental right" by "render[ing] the right to defend with counsel an empty formality," id. at 251 (quotations omitted), and depriving the defendant of an opportunity to adequately prepare his defense.

"There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." Ungar v. Sarafite, 376 U.S. 575, 589 (1964). Rather, "[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Id. We have explained that the "[d]enial of a continuance, requested by a defendant in order to permit additional preparation for trial, must be upheld unless the defendant can show an abuse of discretion and specific, substantial prejudice." United States v. Saget, 991 F.2d 702, 708 (11th Cir. 1993). "To make such a showing, [the defendant] must identify relevant, non-cumulative evidence that would have been presented if his request for a continuance had been granted." Id. We have also considered the "time available for preparation, the likelihood of

10

prejudice from denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, and the availability of discovery from the prosecution." United States v. Uptain, 531 F.2d 1281, 1286 (5th Cir. 1976)[1] (footnotes omitted).

The facts of this case suggest to us that the trial court would have been wiser to grant a continuance or at least a short recess. After all, the video was not made available to Jeri until the morning of trial and he did not get to watch the video until after the first day of the day-and-a-half-long trial, by which time five Government witnesses had already testified.

However, we cannot say that this error was fatal because Jeri has not shown (as he must) specific or substantial prejudice caused by the denial of a continuance. The essential point is that the video showed the luggage only after the contents had been unloaded and after the contraband had been removed. The video did not depict the contraband as it was unloaded from Jeri's bags, and it did not show the initial search of the bags that revealed the contraband. The clips that Jeri sought to introduce showed items inside open suitcases, items being removed from Jeri's personal suitcase, and items being returned to that suitcase. The defense says these clips prove that Jeri was not carrying cocaine in his personal carry-on bag and

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

11

impeach the government witnesses who said otherwise. However, these clips also showed the items that contained cocaine -- the notebooks, purses, jackets, and pillows -- already laid out on a table, indicating that they had been removed before anything was filmed. Indeed, we have no way of telling from the video which purses, pillows, and jackets came from which suitcase.

In these circumstances, we are hard-pressed to see how a video showing contraband already spread out on tables would have exculpated Jeri. In the absence of any footage of cocaine actually being removed from the suitcases, a video filmed after the cocaine had been removed does not add much, if anything at all, to an evaluation of whether Jeri knew the suitcases contained cocaine or whether his carry-on bag also contained cocaine. The officers depicted on the video repeatedly mentioned that cocaine was found in all three bags. Finally, it's worth noting that the defense spent much of its cross-examination of Officer Laucerica highlighting the missteps in her examination, including her failure to create itemized property receipts delineating which items containing cocaine were pulled from which suitcase. Thus, even if it was a mistake to deny the motion to continue, Jeri has not shown specific, substantial prejudice stemming from the delay.

Jeri's earlier motions to continue fare no better. Those applications sought additional time to investigate and interview potential witnesses, namely,

12

individuals who appeared on the transcripts of the controlled calls.  However, to succeed on these claims, Jeri must show that "due diligence has been exercised to obtain the attendance of the witness, that substantial favorable testimony would be tendered by the witness, that the witness is available and willing to testify, and that the denial of a continuance would materially prejudice the defendant."  Id. at 1287. Jeri's motions do not satisfy this score and merely claim, only at the highest order of abstraction, that he "needs more time to investigate the information."  This bare assertion, without more, is not enough.

Despite this obvious conclusion, it is worth reiterating "that a scheduled trial date should never become such an overarching end that it results in the erosion of the defendant's right to a fair trial."  Id. at 1291.  The costs attendant to a continuance were low, but the potential risk to the defendant was real.  While we are acutely aware of the district courts' heavy caseloads and fully appreciate the important public interest in their expeditious resolution, it is often wise to counsel patience in finding the "delicate balance between the defendant's right to adequate representation by counsel of his choice and the general interest in the prompt and efficient administration of justice."  United States v. Baker, 432 F.3d 1189, 1248 (11th Cir. 2005), abrogated in part on other grounds by Davis v. Washington, 547 U.S. 813 (2006).

13

III.

Jeri raises several other trial-related issues that he says warrant a new trial. First, he claims that he was prejudiced by the delayed disclosure of the "Drug Wars" video and that the trial court abused its discretion by excluding the video and the transcripts of the controlled calls and text messages. Jeri also offers that the trial court improperly limited his ability to cross-examine two witnesses and allowed two Government witnesses to improperly opine. Finally, he challenges the jury instructions because they included a deliberate ignorance instruction. We are persuaded by none.

"A timely motion for new trial is addressed to the sound judicial discretion of the trial court"; therefore, "[a] decision denying a new trial motion is reviewable only for an abuse of that discretion." Hercaire Int'l, Inc. v. Argentina, 821 F.2d 559, 562 (11th Cir. 1987). In evaluating whether specific trial errors warrant a new trial, we apply the harmless-error standard found in Fed. R. Civ. P. 61. Rule 61 says that "a new trial is warranted only where the error has caused substantial prejudice to the affected party (or, stated somewhat differently, affected the party's substantial rights or resulted in substantial injustice)." Peat, Inc. v. Vanguard Research, Inc., 378 F.3d 1154, 1162 (11th Cir. 2004) (quotations omitted). With this deferential standard in mind, the challenged trial rulings are taken in turn.

14

A.

Jeri first challenges the delayed disclosure of the "Drug Wars" video, as well as the trial court's exclusion of the video and transcripts of the controlled calls and text messages. We have already addressed the delay and the attendant motions for a continuance. As for the district court's evidentiary rulings, we review only for an abuse of discretion. United States v. Wilk, 572 F.3d 1229, 1234 (11th Cir. 2009). "An abuse of discretion occurs if the district court applies an incorrect legal standard or makes findings of fact that are clearly erroneous." Id. "Erroneous evidentiary rulings will not result in reversal if they are 'harmless,' meaning that the party asserting error has not shown prejudice to a substantial right." United States v. Burston, 159 F.3d 1328, 1336 (11th Cir. 1998). "[E]rrors that do not 'affect substantial rights must be disregarded.'" United States v. Frazier, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (en banc) (quoting Fed. R. Crim. P. 52(a)).

1.

The trial court excluded the video, saying that it was "unhelpful, cumulative, irrelevant, and potentially misleading." Jeri makes two arguments regarding the "Drug Wars" video. First, he says that the delayed disclosure of the evidence amounted to a violation of Brady v. Maryland, 373 U.S. 83 (1963). He also claims that the exclusion of the video violated the Due Process Clause because he was prevented from presenting relevant evidence. Neither claim is persuasive.

15

The Supreme Court has long held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. Evidence that would impeach government witnesses also falls into this category. See United States v. Bagley, 473 U.S. 667, 676 (1985). "A Brady violation can also occur if the prosecution delays in transmitting evidence during a trial, but only if the defendant can show prejudice, e.g., the material came so late that it could not be effectively used." United States v. Beale, 921 F.2d 1412, 1426 (11th Cir. 1991). To establish a violation of Brady, then, "a defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to him; and (3) the evidence was material to the establishment of his guilt or innocence." Id. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. To succeed, therefore, the defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995).

Jeri does not claim that the Government purposefully suppressed the video; rather, he says that the video was disclosed too late to be of any use in his efforts to

16

impeach the Government's witnesses.  But after viewing the video, we conclude that it was not material to Jeri's defense and that, had it been admitted, it would not have changed the result.  Again, the video was not exculpatory because it showed that the seized cocaine had already been laid out on a table; it did not show the cocaine as it was being pulled from any of the bags.  The video clips had precious little bearing on whether Jeri knew he was transporting cocaine (the ultimate issue in the case) or on which bags contained cocaine when Jeri entered the country.  In short, the video clips did not make the knowledge element any more or less certain and their exclusion did not preclude Jeri from presenting his defense.  In fact, he repeatedly argued that his personal carry-on bag did not contain cocaine.  On this record, there was no Brady violation.

Jeri's second claim grounded in due process substantially overlaps with his Brady argument.  It is no more convincing than the first one.  The exclusion of four types of evidence may, in some circumstances, violate the Compulsory Process and Due Process Clauses: (1) evidence "directly pertaining to any of the actual elements of the charged offense or an affirmative defense"; (2) evidence "pertaining to collateral matters that, through a reasonable chain of inferences, could make the existence of one or more of the elements of the charged offense or an affirmative defense more or less certain"; (3) evidence that "is not itself tied to any of the elements of a crime or affirmative defense, but that could have a

17

substantial impact on the credibility of an important government witness"; and (4) evidence that, "while not directly or indirectly relevant to any of the elements of the charged events, nevertheless tends to place the story presented by the prosecution in a significantly different light, such that a reasonable jury might receive it differently." United States v. Hurn, 368 F.3d 1359, 1363 (11th Cir. 2004). However, even a constitutional error of this nature is subject to harmless-error review: "[A] conviction tainted by constitutional error must be set aside unless the error complained of was harmless beyond a reasonable doubt." Kyles, 514 U.S. at 436 (quotations omitted).

The video does not fit into any of the Hurn categories. It does not directly pertain to the actual element of the charged offense that was at issue at trial (Jeri's knowledge); it does not make that element any more or less certain; it does not pertain to collateral matters that could make the existence of that element more or less certain; and, finally, it does not place the prosecution's story in a significantly different light. The video also does not substantially affect the credibility of Government witnesses, again, because it only showed the cocaine after removal from Jeri's luggage. Most significantly, it does not refute any testimony that cocaine was found in several vessels secreted in Jeri's carry-on bag. The district court did not violate the Due Process Clause in excluding the video.

18

2.

Jeri also challenges the exclusion of several transcripts made of the controlled calls Jeri had placed to Lopez. As instructed by law-enforcement officers, Jeri told Lopez that a white powder was leaking out of one bag, that he smelled a strange odor, and that he was not comfortable traveling further. Lopez explained that the powder was "vitamins," that the smell was "oregano," and that he should continue on his travels. Lopez then called Jeri back with another woman on the line who assured him that the bags were checked in Peru and did not contain drugs. The officers also sent text messages to Lopez, her associates, and her cousin in an unsuccessful attempt to arrange for a transfer of the bags. The trial court excluded these transcripts, too, as being inadmissible hearsay and otherwise irrelevant. We can discern no abuse of discretion in these evidentiary calls.

Hearsay is defined as an out-of-court statement that is offered as evidence "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay evidence is generally inadmissible unless it falls under one of the stated exceptions to the hearsay rule. See Fed. R. Evid. 803–04; Baker, 432 F.3d at 1203. As relevant to this case, the state-of-mind exception says that statements "of the declarant's then-existing state of mind (such as motive, intent, or plan)" are admissible. Fed. R. Evid. 803(3); accord United States v. Rivera, 780 F.3d 1084, 1092 (11th Cir. 2015) ("Generally, an out-of-court statement admitted to show its

19

effect on the hearer is not hearsay.").  However, before a statement that would otherwise be inadmissible hearsay "can be admitted under 803(3) to show the declarant's then existing state of mind, the declarant's state of mind must be a relevant issue in the case."  United States v. Scrima, 819 F.2d 996, 1000 (11th Cir. 1987).

To the extent Jeri offered the transcripts in order to prove the truth of his or Lopez's statements, the transcripts were properly excluded as hearsay.  And to the extent they were offered to illuminate the state of mind either of the defendant or of Lopez, they were properly excluded.  For starters, Jeri was coached by law enforcement on what to say, so his statements can hardly be said to reflect his true state of mind.  Jeri also claims, however, that the transcripts reveal Lopez's state of mind -- but Lopez's state of mind is wholly irrelevant.  Lopez was not on trial, and indeed, introducing the transcripts might have confused the jury on this score.  Nor did anything Lopez said illuminate the defendant's state of mind.  Finally, Jeri claims that the transcripts should have been admitted under the rule of completeness, found in Fed. R. Civ. P. 106.  Rule 106 says that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part -- or any other writing or recorded statement -- that in fairness ought to be considered at the same time." Fed. R. Evid. 106.  However, the Government did not introduce any part of a

20

written or recorded statement.  Rather, various witnesses testified from their personal experiences regarding what Jeri told them during in-person interviews.  Plainly, the transcripts were not required to qualify, explain, or contextualize Jeri's in-person statements, and there was no abuse of discretion in excluding them.

But even if we were to assume that the transcripts were relevant and admissible, their exclusion was harmless.  See United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999) ("An erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless.").  For one thing, there was a strong evidential, if circumstantial, foundation that Jeri knew he was transporting cocaine.  Jeri had previously refused to transport Lopez's bags back from Peru, supposedly because "he had watched the news and had seen drug seizures on the news . . . and he didn't feel comfortable" with transporting bags from Peru to New York.  Nevertheless, this time he agreed to transport bags both to and from Peru, despite his earlier concerns about drug seizures.  He also lied to the agents by saying, among other things, that he was carrying jackets for his children.  Moreover, every bag that he carried and every bag that he checked contained cocaine concealed in notebooks, jackets, purses, or bottles.  Even if the transcripts of the calls and the text messages had been presented, there is no reasonable likelihood that the outcome would have been different.

21

B.

Jeri next claims that the trial court abused its discretion by limiting his cross- and recross-examination of two Government witnesses: Officer Laucerica and Agent Escobar. "The trial court has broad discretion under [Federal Rule of Evidence] 611(b) to determine the permissible scope of cross-examination and will not be reversed except for clear abuse of that discretion." United States v. Jones, 913 F.2d 1552, 1564 (11th Cir. 1990); see also Fed. R. Evid. 611(b) ("Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility. The court may allow inquiry into additional matters as if on direct examination."). "The denial of a defendant's Confrontation Clause right to cross-examination is examined for harmless error." United States v. Ndiaye, 434 F.3d 1270, 1286 (11th Cir. 2006). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Id. (quoting Olden v. Kentucky, 488 U.S. 227, 232 (1988).

It is well established that "[t]he right of confrontation guaranteed by the Sixth Amendment includes the right of cross-examination." United States v. Lankford, 955 F.2d 1545, 1548 (11th Cir. 1992). However, "[t]he defendant's right to cross-examine witnesses is not without limitation. He is entitled only to an opportunity for

22

effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." United States v. Baptista-Rodriguez, 17 F.3d 1354, 1366 (11th Cir. 1994) (quotations omitted). The district court retains "wide latitude" to "impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

The availability of recross-examination likewise falls within the trial court's broad discretion, but "[a]s opposed to cross-examination, a defendant has no constitutional right to recross-examination." United States v. Ross, 33 F.3d 1507, 1517–18 (11th Cir. 1994). Rather, he has only a "limited right to recross-examination where a new matter is brought out on redirect examination." Id. To allow redirect examination on new material but to deny recross-examination on the same material may violate the Confrontation Clause. Id. at 1518. However, "[r]eversal is not required if, assuming the damaging potential of recross-examination was fully realized, the error was harmless beyond a reasonable doubt." Id. In this analysis, we consider "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted,

23

and . . . the overall strength of the prosecution's case." Id. (quoting Van Arsdall, 475 U.S. at 684).

As for Laucerica, Jeri claims that cross-examination was improperly limited in the following exchange:

Q. He told you a little bit more information about Fancy [Lopez], didn't he?

A. He was mentioning about that that's his friend for they work together, but --

[Government]: Objection, Your Honor; this is hearsay.

THE COURT: Sustained.

While this question alone may not have elicited a hearsay response, any further questions about what Jeri told Laucerica would likely have elicited hearsay. But even if this evidential ruling was error -- and we don't think that it was -- it would not only have been harmless but harmless beyond a reasonable doubt. What Jeri told Laucerica about Lopez had already come into evidence and was repeated later in the trial. Earlier during cross-examination, Laucerica testified that Jeri said Lopez was his friend, that he had gotten his ticket from her, and that they work together. Later, Agent Escobar testified that Jeri said he had known Lopez for ten years, that they worked together, and that he "c[ould]n't believe she did that to [him]." These statements were repeated throughout the testimony of Laucerica and Escobar.

24

Moreover, Jeri's additional claim that Laucerica's statements should have been admitted under the rule of completeness likewise falls short because the Government never attempted to introduce any written or recorded evidence of the calls. There was no statement for Laucerica to complete.

As for Escobar, Jeri raises two issues. First, the defendant says the trial court improperly sustained two objections during his cross-examination in the following exchanges:

> Q. Now, he tells CBP that he is carrying souvenirs for his sister, correct?
>
> A. I believe so.
>
> > [Government]: Objection; hearsay.
> >
> > THE COURT: Sustained.
>
> . . .
>
> Q. So he continued to insist that this woman was his friend for 10 years, they were close, and he thought she would never do something like this to him, correct?
>
> > [Government]: Objection; calls for speculation.
> >
> > THE COURT: Sustained.

To the extent the first statement, regarding the souvenirs, was offered to prove whether Jeri was carrying souvenirs, it was properly excluded as hearsay. As for the second statement, Escobar would not have needed to speculate in order to tell the jury whether Jeri said he was close to Lopez. But even if the trial court had erroneously ruled, again, any error would be harmless. Testimony on these points

25

had already been elicited at length and was amplified later in the trial.  Thus, Officer Laucerica testified, on both direct and cross-examination, that Jeri said he was carrying souvenirs for his sister, so that fact had already been presented to the jury by the time Escobar testified.  And during cross-examination, Escobar repeatedly mentioned -- without objection -- Jeri's statement that he had known Lopez for ten years and that he thought she "would never do something like this to him."  Only later, when defense counsel asked Escobar whether Jeri had "continued to insist" that he and Lopez were close and that she would never do something like this to him, was an objection based on speculation sustained.  Indeed, even after the objection, defense counsel continued to refer to that statement and the trial court eventually allowed that statement in for its effect on the listener.  The repeated mention of these facts strongly suggests that these rulings -- even if erroneous -- were harmless.

Jeri offers a second line of attack.  He claims that the Government's new line of questioning of Escobar -- "Have you ever interviewed a drug courier who came equipped with a back story?" and "So in the context of drug couriers, what's a back story?" -- during redirect examination should have been excluded.  The defense counsel's objections were overruled.  The trial court also barred any recross-examination.  Jeri says these limitations, too, deprived him of his right to confront his accusers.

26

On redirect examination Escobar was asked, for the first time, if he had "ever interviewed a drug courier who came equipped with a back story," what a back story is, and whether drug couriers are ever given anything to corroborate their back stories. As we see it, these questions were not beyond the scope of the cross-examination -- rather, they went directly to the credibility of Jeri's defense that he was "duped" by Lopez. During cross-examination, defense counsel repeatedly mentioned Jeri's statement that "he thought she would never do something like this to him" in an attempt to bolster the claim that Jeri did not know he was carrying narcotics and had been set up; as Jeri said, this was his "entire defense." The prosecution was entitled to challenge all of this by probing the witness on redirect about whether the statements were part of a back story given to Jeri by Lopez, or, put differently, whether Jeri had been coached on his answers. There was no abuse of discretion in denying Jeri the opportunity to recross the witness.

But even if Jeri had not opened the door to this line of questioning with his cross-examination, the denial of recross was harmless. The import of the new information was minimal, especially in light of later testimony brought out by the defense from Agent Suarez. Jeri himself asked the Government's drug-courier expert, Suarez, questions about drug-trafficking organizations and the information that couriers are provided and could have probed Suarez further on that point. Nor

27

has Jeri explained what recross-examination may have established, or, indeed, what specific questions he was precluded from asking.  Moreover, the trial court did not prevent Jeri from calling Escobar as his own witness, a factor that also supports a finding of harmlessness.  See Ross, 33 F.3d at 1518 ("[A]lthough the court denied Appellant the opportunity to recross-examine Herrera, the court in no way prevented Appellant from calling Herrera as his own witness and questioning him directly about his observations.").  Finally, the Government's case against Jeri was strong.  In short, he has not come close to establishing how the opportunity for recross-examination would have affected the outcome of the case.

## C.

Jeri also challenges the testimony of two Government witnesses, lay witness Escobar and expert witness Suarez.  "We review the district court's ruling regarding the admissibility of the agent's lay testimony under Rule 701 for a clear abuse of discretion."  United States v. Jayyousi, 657 F.3d 1085, 1102 (11th Cir. 2011).  "We review for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion."  Frazier, 387 F.3d at 1258.

## 1.

Jeri claims that the district court improperly permitted Escobar, a lay witness, to testify as an expert and allowed Escobar to opine about the ultimate

28

issue in the case.  Opinion testimony by lay witnesses is governed by Federal Rule of Evidence 701, which limits the testimony to opinions that are "rationally based on the witness's perception"; "helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Notably, "Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences."  United States v. Hill, 643 F.3d 807, 841 (11th Cir. 2011).

In this case, Escobar was slated to testify as a lay witness and was not noticed as an expert.  Jeri claims, however, that Escobar's lay testimony impermissibly crossed over the line into expert testimony.  But "[j]ust because [a lay witness's] position and experience could have qualified him for expert witness status does not mean that any testimony he gives at trial is considered 'expert testimony.'"  United States v. LeCroy, 441 F.3d 914, 927 (11th Cir. 2006).  Lay witnesses may draw on their professional experiences to guide their opinions without necessarily being treated as expert witnesses.  See id.  Indeed, law-enforcement officers can testify as lay witnesses even though their expertise often makes them more efficient or productive at their jobs.  See Jayyousi, 657 F.3d at 1103–04.

29

The claimed error began when, on redirect, the prosecutor asked Escobar about his experience interviewing drug couriers and about the relative size of this seizure. Escobar said that he had done "over 50, maybe a hundred, over a hundred interviews of investigations that are related to narcotics." He had been both the primary case agent and a co-case agent in "countless narcotics investigations stemming from marine narcotics trafficking through couriers through passengers' narcotics investigations, conspiracy." He also testified that he had interviewed drug couriers who came with a prepared back story. Finally, Escobar said that, based on his experience investigating drug couriers, this was a "very meticulous and a very -- a thought-of plan," and that seizures of this size attract media attention. His testimony was not improper expert testimony; it merely showed Escobar's familiarity with narcotics investigations and his experience interviewing drug couriers, which had been developed during his tenure as a law-enforcement officer.

But even if Escobar actually offered an expert opinion, any claimed error would be harmless. For starters, Escobar could have been qualified as an expert. Escobar had eight years of experience conducting narcotics investigations and had participated in as many as one hundred investigations. Moreover, the fact that the Government failed to notice Escobar as an expert would not, standing alone, warrant reversal. Even if we agreed that Escobar should have been classified and

30

disclosed as an expert witness, that deficiency "will result in a reversal of conviction only if such a violation prejudice[d] [the defendant's] substantial rights." United States v. Hamaker, 455 F.3d 1316, 1332 (11th Cir. 2006) (quotations and alteration omitted). Jeri has not made that showing. The defense knew before trial that Escobar would testify and that he had played a substantial role in the investigation. The defense also knew that testimony about drug couriers would be elicited from one of the Government's expert witnesses and had ample opportunity to prepare for and cross-examine that witness. Nor was Jeri precluded from calling either Escobar or Suarez as his own witness. Again, Jeri has not shown how the Government's failure to identify Escobar as an expert prejudiced his substantial rights.

Jeri also claims, however, that Escobar improperly opined on an ultimate issue -- Jeri's knowledge. It is well recognized that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). However, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). "An expert testifies 'with respect to' the mental state or condition of a defendant when an inference of the facts testified to is that the defendant had the mental state or condition constituting an element of

31

the crime." United States v. Alvarez, 837 F.2d 1024, 1031 (11th Cir. 1988). Thus,

an expert "cannot expressly state a conclusion that the defendant did or did not

have the requisite intent"; nor can the expert "stat[e] an opinion as to the

defendant's state of mind at the time of the offense." Id.

Jeri claims that Escobar testified as to the ultimate issue in the case -- Jeri's

state of mind when he brought his luggage (and the cocaine) into the United States

-- during the following exchange between the prosecution and Escobar:

> Q. In this case, based on your training and experience, was the defendant
> truthful in his interview with you?
>
> [Defense Counsel]: Objection; ultimate issue.
>
> THE COURT: Overruled.
>
> By [Prosecution]:
>
> Q. You can answer the question, Special Agent.
>
> A. He was not truthful.
>
> Q. Why do you say that?
>
> A. Throughout the interview it was obvious that he had long pauses, some
> of the answers he was evasive. I have been around long enough and done
> plenty of interviews to be familiar with those types of behaviors.

Jeri claims that because Escobar was testifying as an expert, this testimony violated

Rule 704(b). But as we have said, Escobar was not testifying as an expert. And

whether Escobar was testifying as a lay witness or as an expert, he did not

improperly give his opinion about whether Jeri knew he was carrying cocaine in

his suitcases. Rather, Escobar drew on his experience as a law-enforcement officer

32

to answer whether he thought Jeri was telling the truth during his interview, which included many questions about how and where Jeri picked up the suitcases, what he did with the suitcases, how he knew Lopez, what happened on his previous trip for Lopez, and for whom he was carrying the bags. While these questions bear on whether Jeri knew he was transporting cocaine, they are wholly subsidiary building blocks of fact that do not squarely and directly answer the ultimate question. This witness was not asked whether Jeri knew he was transporting cocaine, nor did he answer any such question.

2.

As for Suarez, Jeri claims that the district court improperly allowed him to testify regarding drug-courier profiles. We have previously noted the inherently prejudicial nature of a drug-courier profile:

> Drug courier profiles are inherently prejudicial. . . . Generally, the admission of this evidence is nothing more than the introduction of the investigative techniques of law enforcement officers. Every defendant has a right to be tried based on the evidence against him or her, not on the techniques utilized by law enforcement officers in investigating criminal activity. Drug courier profile evidence is nothing more than the opinion of those officers conducting an investigation. Although this information is valuable in helping drug agents to identify potential drug couriers, we denounce the use of this type of evidence as substantive evidence of a defendant's innocence or guilt.

United States v. Hernandez-Cuartas, 717 F.2d 552, 555 (11th Cir. 1983). Thus, we have said that "the use of drug courier profiles to establish reasonable suspicion should be viewed critically." Id. However, if drug-courier profiles are used

33

"purely for background material," then "both the prejudicial effect and the probative value of this evidence is highly questionable." Id.

In this case, however, Suarez did not testify about drug-courier profiles or about how law-enforcement officers identify potential drug couriers. Rather, Suarez's testimony focused on the street value of the cocaine found, the methods that couriers use to conceal cocaine, the qualities of liquid cocaine, the amount of information couriers are typically given about the scope of the enterprise, how (and how much) couriers are paid, and how "blind mules" operate. All of this was permissible and is testimony that is commonly offered in narcotics cases. See United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir. 2006) (acknowledging the "well-established rule that an experienced narcotics agent may testify as an expert to help a jury understand the significance of certain conduct or methods of operation unique to the drug distribution business") (quotations omitted); United States v. Chastain, 198 F.3d 1338, 1349 (11th Cir. 1999) (allowing expert testimony about "general techniques of drug smugglers" and modifications to an airplane that made it more suitable for drug smuggling); United States v. Costa, 691 F.2d 1358, 1361–62 (11th Cir. 1982) (allowing expert testimony "regarding the street value and purity of the cocaine" at issue). See also United States v. Long, 328 F.3d 655, 666 (D.C. Cir. 2003) (allowing expert testimony about the "modus operandi of persons involved in illegal drug trafficking"); United States v.

34

McDonald, 933 F.2d 1519, 1522 (10th Cir. 1991) (allowing expert testimony regarding the qualities of rock cocaine).

Suarez never offered an opinion about whether Jeri knew he was transporting cocaine.  Indeed, Suarez clarified for the jury that he was not involved in Jeri's investigation at all and that he was there to testify solely regarding the value of the cocaine and the methods that drug organizations use to smuggle drugs.  In fact, his testimony even supported the conclusion that Jeri was not a drug courier.  While he noted that drug couriers "come from all walks of life" and are frequently U.S. citizens, he also said that it would be uncommon for a courier to know personal details about the recipient like her address, phone number, and workplace, as Jeri did.  Quite simply, it was not an abuse of discretion for the trial court to allow Suarez's testimony.

D.

Jeri next argues that the district court abused its discretion by instructing the jury on deliberate ignorance.  He claims that this instruction was improper because it was unsupported by any evidence and because the Government could argue either actual knowledge or deliberate ignorance, but not both.  We remain unpersuaded.

A district court's decision on whether to give a jury instruction is reviewed for abuse of discretion.  Ndiaye, 434 F.3d at 1280.  "So long as the instructions

35

accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions." United States v. Starke, 62 F.3d 1374, 1380 (11th Cir. 1995). Accordingly, "[a] conviction will not be reversed on the basis of an improper jury charge unless the issues of law were presented inaccurately, the charge included crimes not in the indictment, or the charge improperly guided the jury in such a substantial way as to violate due process." United States v. Felts, 579 F.3d 1341, 1344 n.1 (11th Cir. 2009) (quotations omitted); see also United States v. Gibson, 708 F.3d 1256, 1275 (11th Cir. 2013) ("We will not reverse a defendant's conviction based on a challenge to the jury charge unless we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.") (quotations omitted).

"The deliberate ignorance instruction is based on the alternative to the actual knowledge requirement at common law that if a party has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge." United States v. Rivera, 944 F.2d 1563, 1570 (11th Cir. 1991) (quotations omitted). Instructing the jury on this theory of knowledge is proper "only when[ ] the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." Id. at 1571 (quotations and alteration

36

omitted).  That is, "a district court should not instruct the jury on 'deliberate ignorance' when the relevant evidence points only to actual knowledge, rather than deliberate avoidance."  Id. (emphasis omitted).  The instruction should be given "only in those comparatively rare cases where there are facts that point in the direction of deliberate ignorance."  Id. at 1570 (quotations and alteration omitted).  However, if there is evidence in the record to support both actual knowledge and deliberate ignorance, then both instructions may be given.  See United States v. Arias, 984 F.2d 1139, 1143 (11th Cir. 1993).

Jeri does not argue that the deliberate-ignorance instruction was inaccurate or that it instructed on crimes that were not listed in the indictment.  Rather, he claims that the instruction "deprived him of his right to a fair trial" because it was unsupported by the evidence.  But there was ample evidence introduced at trial to support the instruction.  Jeri admitted that he had previously refused to transport Lopez's bags from Peru to New York because of his concerns about drug seizures at airports.  According to Escobar, Jeri said "that he had watched the news and had seen drug seizures on the news and had also seen -- particularly he mentioned The Discovery Channel, and he didn't feel comfortable with it," and that "he had seen what had happened" when drugs were seized.  Moreover, the cocaine was secreted in ten purses, seven jackets, several notebooks, three pillows, and two bottles distributed across all three of his bags.  There was substantial evidence of deliberate

37

ignorance on Jeri's part, and it was within the trial court's discretion to instruct the jury accordingly.  Moreover, there was ample evidence of actual knowledge as well.  The trial court did not abuse its discretion by giving both instructions.

E.

Finally, Jeri contends that the cumulative prejudicial effect of the trial errors requires a new trial.  The doctrine of cumulative error "provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." Baker, 432 F.3d at 1223 (quotations omitted).  "When we address a claim of cumulative error, we consider all errors preserved for appeal and all plain errors in the context of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." United States v. House, 684 F.3d 1173, 1197 (11th Cir. 2012) (quotations omitted).  The total weight of the error depends on many factors including, inter alia, "the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy -- or lack of efficacy -- of any remedial efforts); the strength of the government's case[;] and the length of trial." Baker, 432 F.3d at 1223 (quotations and alteration omitted).

Here, we have concluded that the trial court's denial of a continuance was harmless error.  We also determined that while some of the trial court's rulings

38

during the testimony of Laucerica and Escobar may have been erroneous, when examined in the context of the entire trial, none deprived Jeri of his right to a fair trial. The claimed errors were not of great weight: the evidence that was excluded was not probative of the ultimate issue at trial, and the limitations on cross-examination excluded testimony that had already been introduced repeatedly by other witnesses or by that very witness earlier in his or her testimony. And while Jeri also complained of error in expert witness testimony and the jury instructions, we conclude that neither of these rulings was erroneous. The error that gives us the greatest pause is the denial of Jeri's request for a continuance after learning of the "Drug Wars" video, but given the contents of the video clips, the defendant has not come close to establishing specific, substantial prejudice. Thus, we can say with confidence, "after pondering all that happened," that "the judgment was not substantially swayed by the error." Id. at 1225 (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)). Accordingly, we AFFIRM.

AFFIRMED.