[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13692

_____

D.C. Docket No. 1:18-cr-20939-CMA-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

KELVIN LORENZO HARRIS,
JAMES ARCHIBALD,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 9, 2021)

Before JILL PRYOR, NEWSOM and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In this reverse sting police corruption case, Miami Police Department

officers Kelvin Harris and James Archibald protected "drug couriers" as they

delivered containers purportedly filled with cocaine to hotels in Miami, Florida.

After a ten-day jury trial, Kelvin Harris[1] and Archibald appeal their convictions for

conspiracy to possess with intent to distribute cocaine, attempted possession with

intent to distribute cocaine, and possession of a firearm in furtherance of a drug

trafficking crime.  Kelvin and Archibald argue that the evidence was insufficient to

support their convictions; that the prosecutor struck an African American juror

because of race, in violation of Batson v. Kentucky, 476 U.S. 79 (1986); and that

the district court erred by not providing the jury with a read-back of Archibald's

testimony.  Archibald also raises issues concerning his entrapment and duress

defenses and says that the prosecutor committed misconduct by shifting the burden

of proof to him.  Finally, Kelvin claims that the district court erred by not

dismissing his indictment because false testimony was knowingly presented to the

grand jury.  We are unpersuaded and, accordingly, affirm the convictions of each

of the defendants.

## I.

These are the essential facts adduced at trial.  As part of an elaborate effort

to root out police corruption in Miami, the Federal Bureau of Investigation ("FBI")

created a reverse sting operation, having some of its agents pose as would-be drug

dealers.  In April 2018, City of Miami Police Officer Catina Anderson became the

---

[1] Two police officers named "Harris" appear in this case, so we use their respective first names.

subject of the ongoing investigation by the Miami Police Department ("MPD") and the FBI. At the end of the inquiry, Anderson agreed to act as a cooperating witness, wear a recording device, and assist the FBI.

Anderson identified MPD Officer Schonton Harris as having corruptly engaged in misconduct, claiming that Harris had taken bribes in exchange for allowing culpable individuals to go free. In May 2018, at the FBI's direction, Anderson approached Schonton about providing protection for the delivery of drug proceeds purportedly belonging to a drug trafficking organization. Anderson explained that her cousin "Jean" needed protection in delivering drug money to a bank and while carrying Percocet pills in his car. Schonton accepted Anderson's offer and took part in four protection operations from May to July 2018. She was paid about $5,000 for her services.

Later that summer, Anderson told Schonton that the drug trafficking organization was growing and needed to enlist more police help. When asked if she knew other law enforcement officers who'd be willing to participate, Schonton suggested they talk to MPD Officer Kelvin Harris. Kelvin joined the group and, on August 16, 2018, began to participate in further narcotics operations designed by the FBI. He arrived at the end of one of Schonton and Anderson's jobs and served as a lookout while Jean deposited drug proceeds at a local bank. The next day, Anderson -- in one of many recorded conversations received in evidence --

3

explained to Kelvin that the officers' role was to provide protection for Jean as he collected and deposited money from the sale of Percocet pills. Kelvin agreed to participate. Anderson paid Kelvin $1,000 for protecting Jean the day before.

As the sting operation unfolded, on September 6, 2018, Anderson and Schonton met with undercover FBI agent "Moe" for dinner at the Hakkasan restaurant in the Fontainebleau Hotel. Moe, who said he knew Jean, claimed to be a high-level member of an east-coast drug trafficking organization that sold "a lot" of cocaine in Miami. Moe explained that the organization was expanding and that it would move several kilograms of cocaine per car to several locations at the same time, so he needed "an army of people" to provide protection. Moe stressed that he would only work with people he could trust. Schonton agreed to be "in charge" of operations for Moe. She said Officer Kelvin was someone who could be trusted.

The next day, Schonton and Anderson asked Officer Kelvin if he was interested in working for Moe's side of the drug trafficking organization by protecting couriers transporting cocaine, or if he wanted to protect drug money instead. Kelvin agreed to work for Moe, starting with a job planned for September 13.

Schonton and Anderson agreed that Schonton would also approach MPD Officer Archibald because it appeared that he had taken many off-duty jobs and this suggested that he might be in need of some extra money. On September 12,

4

Schonton told Anderson that Officer Archibald was "all in."  Although it was too late for Archibald to participate in the job planned for the next day, Schonton told Moe she had found another MPD officer who would provide police protection.

On September 13, Schonton and Officer Kelvin escorted Jean, who seemingly was transporting cocaine from a bus station to a Miami hotel where Anderson was waiting.  Later, the three escorted Jean to the highway so he could leave town.  The next day Anderson paid Officers Schonton and Kelvin $2,500 each in cash.

On September 17, Schonton reconfirmed that Archibald wanted to participate in the next drug operation.  Moe explained that he needed the officers soon for a "big" job.  On September 28, Moe told Schonton that drug couriers "Jay" and "Jamaal," also undercover agents, would soon be transporting cocaine and would require protection.  Moe described two 20-kilogram cocaine shipments -- purportedly worth about $1.4 million -- going in opposite directions in Miami.

As arranged, the four officers met Jay and Jamaal at a Greyhound bus station in Miami.  Each courier's vehicle contained about twenty kilograms.  The product had been loaded into the vehicles before the officers arrived.  Kelvin and Anderson escorted Jamaal to one hotel; Archibald and Schonton accompanied Jay to another.  Kelvin activated his police lights to help Jamaal navigate heavy traffic.  After Jay

and Jamaal dropped off the suitcases at their respective hotels, they told each group of officers that Moe would pay them later that day.

That night, Officers Kelvin and Archibald met Moe in his car at the Fontainebleau Hotel. Moe paid each of them $2,500 in cash for their help. Moe emphasized the importance of loyalty and told them that they had provided protection for moving some forty kilograms of cocaine earlier that day. Moe also gave the officers an opportunity to withdraw from any further involvement in the operations of his drug trafficking organization. (Moe explained: "And so moving forward, I wanna make sure ya'll are onboard and ya'll are part of the family. If you're not part of the family, or not gonna be onboard with making sure this weight gets moved around and this powder gets moved around, then let me know. Forget you ever met me.") Both said they wanted to continue.

The FBI arranged still another sting operation for October 11, 2018; this time, the officers would pick up a shipment of cocaine at a local marina and deliver it to two separate locations in Miami. The operation was characterized as the "next step," and it meant that these officers, in the words of FBI Agent Andrew Mercurio, were prepared "to run the drug trafficking operation all on their own." Schonton told Anderson, Kelvin, and Archibald to meet at her home. Moe instructed Schonton to pick up the cocaine at the Crandon Marina, but they had to

6

wait for Archibald, who arrived later, which required him to use his police lights to get there faster.

Schonton and Archibald left for the marina in her personal vehicle, followed by Anderson and Kelvin in Anderson's marked police car. Schonton and Archibald arrived first. Schonton met her contact at the marina dock, motioning for Archibald to join them. A man unloaded two coolers from a boat, which he and Archibald placed in Schonton's car. As Schonton and Archibald were leaving, Archibald directed Anderson to their location outside the marina. Archibald and Schonton headed to a Marriott hotel to make the first delivery; Anderson and Kelvin followed.

Upon their arrival, Kelvin helped Schonton and Archibald unload the coolers. He waited in Schonton's car while she and Archibald took the coolers to Jamaal, who was inside the hotel. As Archibald and Schonton watched, Jamaal removed the bricks of what purportedly was cocaine from one cooler and spread them onto the bed in order to count them. Archibald and Schonton left Jamaal's hotel room with the second cooler.

The four MPD officers delivered the second cooler to undercover agent Jay, who was at another Marriott hotel in Miami. Kelvin stayed in Schonton's car while she and Archibald carried the cooler into the hotel. They watched as Jay counted fifteen bricks and placed them onto a bed in a hotel room. At dinner that

night, again at the Hakkasan restaurant, Moe paid Schonton, Anderson, and Kelvin each $4,000 in cash and gave Anderson $4,000 for Archibald, who was not at the dinner.  Around midnight, Anderson paid Archibald $4,000 for his services at Schonton's house.

Archibald, Kelvin, and Schonton were arrested on October 23, 2018. Schonton pled guilty to conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, and Anderson pled guilty to extortion in a different matter before the trial in this case took place.

A grand jury sitting in the Southern District of Florida returned a superseding indictment charging Kelvin and Archibald with (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), 846 (Count 1); (2) two counts of attempted possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A)(ii), 846 and 18 U.S.C. § 2 (Counts 4 and 6); and (3) two counts of using, carrying, and possessing a firearm during and in furtherance of the drug trafficking crimes, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (2) and 21 U.S.C. § 846 (Counts 5 and 7).  Kelvin was charged separately for his actions on September 13, with: (1) attempted possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(C), 846 and 18 U.S.C. § 2 (Count 2); and (2) using, carrying, and possessing a firearm  during and in furtherance of a drug

8

trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (2) and 21 U.S.C. § 846 (Count 3).

Archibald mounted a two-pronged defense at trial. First, he claimed that he did not know what was going on during the September 28 sting operation. He also argued that he was entrapped that night when he met with the undercover agents. They scared him, he averred, in his trial testimony. The court declined to give the jury an instruction on duress, as Archibald had requested, but allowed him to testify and offer evidence about the threats he perceived.

For his part, Kelvin also testified in his own defense, claiming that while he realized Schonton and Anderson were involved in illegal conduct, he decided to conduct his own surreptitious, but lawful investigation by infiltrating the drug operation. He offered evidence that he sent a memorandum to his police chief asking to meet with the chief about his duty status. He claimed that he planned to use the meeting to disclose the wrongdoing. However, the meeting was repeatedly rescheduled and never took place.

The jury found Kelvin guilty on all counts. Archibald was found guilty on Counts 1 and 6, but acquitted on Counts 4, 5, and 7. Kelvin was sentenced to a total term of imprisonment of 331 months. Archibald was sentenced to concurrent terms of 120 months in prison. These timely appeals followed.

**II.**

Kelvin and Archibald first claim that the evidence was insufficient to support any of their drug convictions, and Kelvin argues separately that the evidence was insufficient to support his firearms convictions as well.  While we normally review a challenge to the sufficiency of the evidence de novo, we may review unpreserved objections to sufficiency only for plain error.  United States v. Zitron, 810 F.3d 1253, 1260 (11th Cir. 2016).  To establish plain error, a defendant must show (1) an error, (2) that is plain, and (3) that affected his substantial rights.  United States v. Turner, 474 F.3d 1265, 1276 (11th Cir. 2007).  If a defendant satisfies these conditions, we may exercise our discretion to recognize the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.  Id.

In district court, both defendants moved for a judgment of acquittal based on insufficiency of the evidence.  Archibald moved to dismiss Count 1 -- the conspiracy count -- but solely on the ground that a reasonable jury could not find that he was predisposed to commit a crime before the evening of September 28, 2018.  He moved to dismiss Counts 4, 5, and 7 based on that claim and generally on sufficiency grounds.  Kelvin's sufficiency argument on the separate drug counts was limited to the claim that the government failed to prove that he knew how much cocaine had been transported.

10

**A.**

On this record, there was ample evidence to sustain the jury verdicts that Kelvin and Archibald conspired and attempted to possess cocaine with intent to distribute, and there was no error, plain or otherwise, in the denial of their Rule 29 motions. See Zitron, 810 F.3d 1260 (applying plain-error review where the appellant "did not make the specific argument in that Rule 29 motion that he makes here").

The Controlled Substances Act makes it unlawful for any person to knowingly and intentionally "possess with intent to . . . distribute . . . a controlled substance." 21 U.S.C. § 841(a)(1); see United States v. Amede, 977 F.3d 1086, 1099–1101 (11th Cir. 2020). Section 846 makes an attempt or a conspiracy to commit those acts a federal crime too. United States v. Benjamin, 958 F.3d 1124, 1131 (11th Cir.), cert. denied, 141 S. Ct. 561 (2020). "A conviction for attempt requires proof only that the defendant possessed the mens rea required for the underlying crime and took a substantial step toward the commission of that crime." Amede, 977 F.3d at 1099 (quotations omitted and alterations accepted). As for a conspiracy, as charged in Count 1, the government "must offer sufficient evidence to prove beyond a reasonable doubt that: (1) an illegal agreement existed to possess with intent to distribute a controlled substance; (2) [the defendants] knew of the agreement; and (3) [the defendants] knowingly and voluntarily joined the

11

agreement." United States v. Isnadin, 742 F.3d 1278, 1305 (11th Cir. 2014). Section 841 provides penalty enhancements for possessing with intent to distribute cocaine, a Schedule II controlled substance, including an enhancement for the possession of five kilograms or more of cocaine. 21 U.S.C. §§ 841(b)(1)(A)(ii), 812.

The government introduced more than enough evidence to support Kelvin and Archibald's conspiracy convictions. The record is replete with statements by the defendants to Moe and their fellow officers that they were "in" or "all in" for Moe's drug operations, and with ample evidence that they provided protection for Moe's drug couriers. Kelvin and Archibald also repeatedly discussed only involving people they could trust in the scheme and devised strategies for keeping their activities secret. Kelvin went so far as to caution the crew not to change their lifestyles to avoid detection, and even promised that the organization's activities would "live and die with [him]." Moreover, the jury heard the testimony of both defendants and could properly consider all of this as substantive evidence. See United States v. Chalker, 966 F.3d 1177, 1188 (11th Cir. 2020).

The record likewise supported Kelvin and Archibald's convictions on Count 6, which charged that they attempted to possess five kilograms or more of cocaine with the intent to distribute on October 11. As for Kelvin, when he arrived at Schonton's house that day, he learned he would make $4,000. While waiting for

Archibald, Kelvin explained that he was still onboard.  Then, during the deliveries of cocaine to the hotels, Kelvin helped Schonton and Archibald unload the coolers from the car and sat in the car while she and Archibald took the coolers to Jay and Jamaal.  When Moe paid Kelvin that night and told him that the organization had moved "100 kilos" that month, Kelvin seemed calm, and, notably, was not surprised at the amount of cocaine that had been trafficked.

As for Archibald, the events of September 28 reveal that by the time he and Kelvin took part in the October 11 marina drug operation, he well knew what he was doing.  Indeed, in a recorded post-arrest interview and at trial, Archibald admitted that he knew he was involved in protecting the drugs when Moe told both him and Kelvin that the couriers had moved "40 birds" or "chickens" that day, and paid each of them $2,500 in cash for their work.  Moe also used terms like "weight" and "powder" to describe cocaine in that recorded conversation.  And when he offered each of the officers an opportunity to withdraw from the operation, they insisted they wanted to continue.  Before leaving, Archibald confirmed that Moe would be in contact with them about new "jobs."

Even if we were to assume that Archibald did not have knowledge of the specific substance he was protecting on September 28 -- despite having heard the term "powder" discussed that very day -- he surely knew what he was doing by the time of the second delivery on October 11, when he appeared relaxed, laughed in

13

the hotel room, and showed no surprise as Jay counted fifteen bricks of false cocaine right in front of him. In fact, Archibald admitted there were thirteen to fifteen kilograms of drugs in each cooler in his post-arrest interview. And, at trial, Archibald testified: "After I saw what was taken out of the cooler, I knew exactly what I was doing."

Moreover, on the evening of October 11, Archibald and Kelvin again contemplated working with the organization in the future. Archibald explained, again in a recorded conversation, that by "puttin' [their] hands on the product now," they had earned the organization's trust. He cautioned that some of Moe's ideas for future deliveries might make it more likely that they would be caught, so the officers rejected these suggestions. After Moe paid Kelvin, and after learning about the large quantity of drugs involved, Kelvin discussed participating still further. On this copious record, a reasonable jury could find, beyond a reasonable doubt, that Kelvin and Archibald knowingly and voluntarily joined an illegal agreement to possess cocaine with the intent to distribute and attempted to do so as well. Isnadin, 742 F.3d at 1305.

The record also sufficiently supported Kelvin's separate drug convictions on Counts 2 and 4 for providing protection on September 13 and again on September 28. The evidence established that on those dates, Kelvin knew he was protecting couriers who, he believed, were transporting large quantities of cocaine. As we've

already detailed, Kelvin, Anderson, and Schonton expressly agreed in advance to work for Moe's organization. In fact, the three officers crafted code words to use when they spoke about cocaine -- they initially considered "powder," Kelvin suggested "snow," but they decided "salt" was a safer term. When Anderson told Kelvin they would be protecting a "salt run" on September 13, Kelvin said it was "a go"; afterwards, Anderson paid Schonton and Kelvin $2,500 each in cash for their efforts.

There also was more than enough evidence to establish, beyond a reasonable doubt, that when Kelvin agreed to the September 28 job, he not only knew that he had agreed to protect a cocaine delivery, but that he would be protecting five kilograms or more of cocaine. When Anderson, Kelvin, and Schonton discussed the deliveries, Schonton noted that the drug couriers would travel in different directions, implying that all together, they would transport large shipments. Moe also told Schonton he needed the officers for a "big" job, later explaining that the couriers would each transport a 20-kilogram cocaine shipment on September 28. A reasonable jury could have inferred, as it did, that when Schonton relayed Moe's plan, she would have told Kelvin how much cocaine was involved.

**B.**

We are also satisfied that the evidence was sufficient to support Kelvin's convictions for possession of a firearm in furtherance of the drug trafficking crimes

15

on September 13, September 28, and October 11, as charged in Counts 3, 5, and 7. Again we review this for plain error. Kelvin argued in district court only that the evidence was insufficient to show that he actually possessed a firearm. On appeal, however, he claims that the evidence was insufficient to show that he possessed the firearm <u>in furtherance</u> of a drug trafficking crime. There was no error, plain or otherwise, in the denial of his Rule 29 motion.

The firearm-possession statute requires proof beyond a reasonable doubt that "during and in relation to" the "drug trafficking crime[s]" (Counts 2, 4, and 6), Kelvin "use[d] or carrie[d] a firearm, <u>or</u> . . . in furtherance of . . . such crime[s], possesse[d] a firearm." 18 U.S.C. § 924(c)(1)(A) (emphasis added). The term "in relation to" means that the "firearm must have some purpose or effect with respect to the drug trafficking crime." <u>Smith v. United States</u>, 508 U.S. 223, 238 (1993). A defendant can "carry" a firearm in violation of the first prong by "possess[ing] and convey[ing] [it] in a vehicle, including in [its] locked glove compartment." <u>Muscarello v. United States</u>, 524 U.S. 125, 127 (1998). As for the second (alternative) prong -- possession in <u>furtherance</u> of a drug trafficking crime -- the government must establish a nexus between the firearm and the crime, that is, it must show that the firearm helped, furthered, promoted, or advanced the drug trafficking. <u>United States v. Timmons</u>, 283 F.3d 1246, 1252–53 (11th Cir. 2002).

16

For starters, Kelvin told Anderson that he had to carry "a pistol" everywhere he went. He was paid $9,000 in all precisely in order to provide armed protection for the cocaine deliveries on September 13 and 28 and on October 11. To this end, on September 12, Anderson asked Schonton to confirm that Kelvin would have a firearm on his person because being armed was an essential requirement for the job. The next day, when Schonton, Anderson, and Kelvin noticed a suspicious man, as they waited for Jean to deliver cocaine to a hotel, Kelvin verified that he had his firearm. Then, on September 28, Schonton told Jamaal not to worry since he had armed officers to protect him. These officers (Kelvin and Anderson) escorted Jamaal, who carried the faux cocaine to a hotel, and kept watch in the hotel parking lot during the delivery.

What's more, before retrieving the cocaine on October 11, Kelvin showed Anderson and Schonton a Sig 365 firearm, which he said held twelve rounds of ammunition. Kelvin even declined Anderson's invitation to drive because he was "more tactical" as a passenger and could take action if necessary. Kelvin told the jury he displayed an "empty" firearm, but claimed that he put it in his glove compartment before getting into Anderson's vehicle and leaving Schonton's house. Anderson contradicted this account, explaining that Kelvin walked straight to her car and never put his firearm away. In concert, this evidence was more than

17

sufficient to sustain the jury's verdicts that Kelvin possessed a firearm when he protected the drugs on September 13, September 28, and again on October 11.

The evidence also was sufficient to support a finding that Kelvin possessed a firearm in furtherance of the drug trafficking crimes. Kelvin's claim that the firearm "played no role in protecting the drugs or the drug dealer," because he did not display it, falls flat. The very purpose of possessing a weapon was to protect the drug couriers as they moved substantial quantities of cocaine on multiple occasions. At the core of Kelvin's role was his responsibility to ensure that the couriers would not be robbed, and being armed was essential to accomplishing the task. Kelvin's possession of the firearm advanced the drug trafficking scheme; the government satisfied the nexus requirement too. Timmons, 283 F.3d at 1253.

## III.

Archibald's next set of claims concern entrapment. The issue arose near the end of the trial, when his counsel sought an entrapment jury instruction on the theory that he did not know what was going on until a government agent -- Moe -- told him so on the night of September 28, and entrapped him.[2] The court agreed to give the instruction and gave a modified version of Eleventh Circuit Pattern Jury

---

[2] Kelvin does not join in Archibald's appeal of the entrapment issues.

Instruction (Criminal Cases) § S13.2.[3]  The court also gave the jury Eleventh

Circuit Pattern Jury Instruction (Criminal Cases) § B10.4, instructing them, in part,

that "[e]ach count of the superseding indictment charges a separate crime against

one or more of the defendants.  You must consider each crime and the evidence

relating to it separately."  After jury deliberations began, Archibald moved to

---

[3] The district court told the jury:

> "Entrapment" occurs when law enforcement officers or others under their direction persuade a defendant to commit a crime the defendant had no previous intent to commit.

> James Archibald and Kelvin Harris claimed to be victims of entrapment regarding the charged offenses.

> The law forbids convicting an entrapped defendant.

> But there is no entrapment when a defendant is willing to break the law and Government merely provide[s] what appears to be a favorable opportunity for the defendant to commit a crime.  For example, it is not entrapment for a Government agent to pretend to be someone else and offer -- directly or through another person -- to engage in an unlawful transaction.
> You must not evaluate the conduct of Government officers or others under their direction to decide whether you approve of the conduct or think it was moral.

> So, a defendant is not a victim of entrapment if you find beyond a reasonable doubt that the Government only offered the defendant an opportunity to commit a crime the defendant was already willing to commit.

> Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute.

> The Government must present evidence beyond a reasonable doubt that a defendant was predisposed, independent of the Government's acts to violate the law, in order for a verdict of guilty to be returned.

> But [if] there is a reasonable doubt about whether a defendant was willing to commit the crime without the persuasion of a Government officer or a person under the Government's direction, then you must find the defendant not guilty.

19

dismiss the indictment, claiming "entrapment as a matter of law." The court denied the motion.

On appeal, Archibald again argues that the evidence was insufficient to sustain the jury finding of predisposition. He relies on his testimony about the night of September 28, when he and Kelvin met Moe at the Fontainebleau Hotel to receive their payments. Archibald explained that as he approached Moe's car, a man told him to leave his phone in his car. Archibald did not think he could say no. Moe testified that Archibald and Kelvin "were uneasy and nervous," although they began to relax after Moe paid each of them $2,500. Archibald testified that he was afraid because another man sat behind him in the car. He also recalled seeing two additional people standing outside of the car -- men who looked like they were part of a security detail.

Once in the car, Moe stressed the importance of loyalty. Archibald recalled that his mind was "all over the place"; he was scared and uncomfortable. When Moe disclosed that they had just moved forty kilograms of cocaine and asked if Archibald and Kelvin would continue, Archibald said his "heart stop[ped]," and "literally [fell] to [his] stomach." Although Moe expressly gave Archibald a chance to withdraw from the scheme, Archibald told the jury that he agreed to participate further because he had no other option.

"Entrapment is an affirmative defense that requires (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to commit the crime before the inducement." United States v. Rutgerson, 822 F.3d 1223, 1234 (11th Cir. 2016). We have explained that "two different decision-makers" evaluate the elements of entrapment at "two distinct stages." United States v. Mayweather, 991 F.3d 1163, 1176 (11th Cir. 2021). First, the trial court must determine if the defendant has produced sufficient evidence of government inducement. Id. "If the defendant meets this initial burden, [he] is entitled to have his defensive theory of the case put before the jury with appropriate instructions from the trial judge." Id. (quotations omitted). "Once before the jury, the burden shifts to the government to prove the defendant's predisposition to commit the crime beyond a reasonable doubt." Id.

Where, as here, the jury has rejected an entrapment defense, we must determine de novo whether the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that the defendant was predisposed to take part in the charged crimes. Rutgerson, 822 F.3d at 1234–35. We review all facts and draw all inferences in favor of the government. Id. at 1234. "Predisposition is a fact-intensive and subjective inquiry, requiring the jury to consider the defendant's readiness and willingness to engage in the charged crime absent any contact with the government's agents." Id. at 1235; see also Jacobson v. United States, 503

21

U.S. 540, 548–49 (1992). Predisposition "focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." Mathews v. United States, 485 U.S. 58, 63 (1988) (quotations omitted).

We have rejected using a "fixed list of factors" to evaluate an entrapment defense, but have posited "several guiding principles":

> Predisposition may be demonstrated simply by a defendant's ready commission of the charged crime. A predisposition finding is also supported by evidence that the defendant was given opportunities to back out of illegal transactions but failed to do so. Post-crime statements will support a jury's rejection of an entrapment defense. . . . Finally, the fact-intensive nature of the entrapment defense often makes jury consideration of demeanor and credibility evidence a pivotal factor.

United States v. Brown, 43 F.3d 618, 625 (11th Cir. 1995) (citations omitted). Moreover, "the question of whether a defendant was entrapped as a matter of law requires 'patently clear' or 'obvious' evidence." Mayweather, 991 F.3d at 1177 n.15 (quoting United States v. Groessel, 440 F.2d 602, 606 (5th Cir. 1971)).

Here, there was ample evidence to sustain the jury's finding that as of October 11, 2018, Archibald was predisposed to participate in the conspiracy charged in Count 1 and in the attempted possession with intent to distribute

22

charged in Count 6.[4]  First, Archibald accepted the "opportunity" Schonton

offered.  In a post-arrest interview, he admitted that Schonton and Kelvin did not

force him to take part in the scheme.  Archibald also had many opportunities to

walk away from criminal involvement and declined to do so.  For one thing, on the

night of September 28, Moe told Kelvin and Archibald to "let [him] know" if they

were not "onboard," and if so they could forget they ever met him.  Thereafter,

Archibald twice confirmed that he wanted to continue.  And before leaving,

Archibald made sure Moe would "be in touch."  Between September 28 and

October 11, Archibald took no steps to walk away from what he admittedly

understood was extensive criminal activity.

Archibald's post-crime conduct also indicated predisposition.  See Brown,

43 F.3d at 625.  On the night of October 11, after providing protection, he

discussed ways to avoid detection with Anderson and Schonton.  He rejected the

idea of involving more people in the undertaking.  He warned that if problems ever

---

[4] We are unpersuaded by the government's argument that we should affirm the district court because there was insufficient evidence of government inducement to submit the entrapment issue to the jury at all.  The transcript makes clear that Archibald's defense was that he did not know what he was doing on September 28 and that the entrapment occurred that night.  (He also argues on appeal that the government brought him into the scheme before September 28, but we decline to consider this argument since he expressly told the district court he was not making it. See United States v. Silvestri, 409 F.3d 1311, 1337 (11th Cir. 2005).)  Given the "light" burden on a defendant to produce evidence of government inducement, we are satisfied that Archibald presented enough evidence to submit the entrapment issue to the jury to decide whether he was predisposed to commit the crimes.  Brown, 43 F.3d at 623; see Mayweather, 991 F.3d at 1181 (noting that "where there is any foundation to support an entrapment defense, the jury should be given an opportunity to consider the defense even though the evidence may be weak, insufficient, inconsistent or of doubtful credibility") (quotations omitted).

arose, the officers would cut their ties. When Anderson said no one even knew their names, he said, "Yeah. Keep it like that." Archibald also remarked that by handling the product, the officers had earned the traffickers' trust. He was laughing at the time, and Anderson testified that Archibald did not appear to be upset.

In the post-arrest interview, Archibald did not admit everything he had done right away. He referred to MPD Officer Schonton as "family," and never mentioned any threats, even when he was asked if he found Schonton to be dangerous. At one point in the interview, Archibald said, "I gotta take responsibility for involving myself in a situation that I knew was wrong." As the interview progressed, he admitted his involvement in the enterprise.

Archibald's text messages provided further evidence about his motive and his predisposition. On September 24, Archibald's wife texted him pictures of expensive Gucci shoes and purses. On October 11, about two hours before he collected $4,000 for transporting cocaine, Archibald asked his wife what size shoe she had so he could buy them for her. And on the night before the October 11 operation, Archibald inquired of his realtor about visiting a home to rent. Indeed, on October 12, he told his wife that they needed to "hurry up and get wealthy."[5]

---

[5] Archibald challenges the admission of these text messages but we find no abuse of discretion. See United States v. Henderson, 409 F.3d 1293, 1297 (11th Cir. 2005) ("We review evidentiary

All together, this evidential foundation was sufficient to sustain the jury's finding on predisposition.

We also are unpersuaded by Archibald's challenge to the district court's answer to an entrapment question the jury posed during deliberations. The jury asked if it could "apply [the definition of entrapment] to each date/count, or is it ONE decision based solely on the INITIAL (of contact) date for each defendant?" The court responded: "Each count of the Superseding Indictment charges a separate crime, and you must consider each crime and the evidence relating to it separately. Please refer to all of my instructions as a whole." This was almost the same instruction the court had given earlier. The language of the initial instruction tracked Eleventh Circuit Pattern Jury Instruction (Criminal Cases) § B10.4 and the defendants did not object to it.

Reviewing for abuse of discretion, we can find none. See United States v. James, 642 F.3d 1333, 1337 (11th Cir. 2011) ("We review the response of the district court to questions from the jury for an abuse of discretion."); United States v. McDonald, 935 F.2d 1212, 1222 (11th Cir. 1991). Our decision in Isnadin is helpful. There, an undercover agent had contacted two of the defendants about

---

rulings for an abuse of discretion."). The district court found the evidence to be relevant to contradict Archibald's defense that he feared for his life and, thus, this went to his credibility. His motivation is also relevant to predisposition. See United States v. Dickens, 524 F.2d 441, 445 (5th Cir. 1975).

25

robbing a stash house.  742 F.3d at 1284.  The defendants presented an entrapment defense, and were convicted of some, but not all, of the charges.  Id. at 1284–86. The district court received the following question from the jury during deliberations: "Count 1 -- How does entrapment the other accounts? [sic]  If we believe in entrapment, are the other charges applicable: count 2, count 3?"  Id. at 1293.  The court instructed the jury "to consider the evidence separately and distinctly as to each defendant and as to each count."  Id. at 1295.

On appeal, a panel of this Court found no abuse of discretion and rejected the defendants' "course of conduct" theory.  Id. at 1298–1302.  While the "course of conduct" inquiry might be relevant to the inducement prong of an entrapment defense, we found it irrelevant to predisposition, the only issue that went to the jury.  Id. at 1301–02.  "Because of the subjective, fact-intensive nature of the predisposition inquiry, it may well be that the facts of a given case indicate that an individual defendant is predisposed to commit some crimes, but not others."  Id. at 1302.

Similarly, here, the evidence presented on predisposition was not the same for each charge.  The factual matrix supporting Archibald's predisposition on October 11 included the recordings from the night of September 28, Archibald's text messages before and after the October 11 operation, his recorded statements on the night of October 11, and his post-arrest interview.  In this case, the trial

26

court properly told the jury to "consider each crime and the evidence relating to it separately."

In sum, there was no abuse of discretion in the district court's handling of the entrapment defense.[6]

## IV.

We are similarly unpersuaded by Archibald's claim that the district court erred by not giving the jury a duress instruction. In order to receive the instruction, a defendant must establish three essential things: he "(1) acted under an immediate threat of death or serious bodily injury; (2) had a well-grounded fear that the threat would be carried out; and (3) had no reasonable opportunity to escape or inform [the] police." Amede, 977 F.3d at 1102 (quotations omitted).

We agree with the district court that Archibald was not entitled to a duress instruction because he did not satisfy the third element. We have refused to approve a duress instruction where a defendant had "numerous reasonable opportunities to inform the police of his predicament." United States v. Sixty Acres in Etowah Cty., 930 F.2d 857, 860 (11th Cir. 1991) (quotations omitted).

---

[6] We also reject Archibald's suggestion that the prosecutor's closing argument on entrapment was improper. The prosecutor argued, "Even if you believe that he had absolutely no idea, which is not believable, but even if you believe that, even if you believe that it wasn't until September 28th that he knew exactly what he was doing, he's back at it less than two weeks later." Archibald's claim that "[t]he jury should not have considered he did a deal on October 11 as evidence of predisposition" is contradicted by our precedent, which holds that "[p]redisposition may be demonstrated simply by a defendant's ready commission of the charged crime." Brown, 43 F.3d at 625.

27

Moreover, "a general concern that a coconspirator might retaliate does not establish the duress defense." Id. at 860–61. Rather, we require a defendant asserting this defense who is "under no immediate threat of reprisal" to "either communicate [his] knowledge to police, or attempt to remove [himself] from the scene of illegal activity." Id. at 861 n.2. Moreover, we evaluate a defendant's belief that he had no reasonable alternative to committing the crime by using an objective standard. United States v. Nwoye, 663 F.3d 460, 464 (D.C. Cir. 2011); see also United States v. Dixon, 413 F.3d 520, 523 (5th Cir. 2005), aff'd on other grounds, 548 U.S. 1 (2006) ("[T]he duress defense requires an objective inquiry into whether a defendant's conduct, although illegal, represented her only reasonable alternative to serious bodily injury or death.").

MPD Officer Archibald had many reasonable opportunities to inform the authorities about his involvement in Moe's drug trafficking organization. After learning from Moe that the service he provided was to protect drug couriers on September 28, Archibald told Schonton that he was "okay." When Schonton started to explain the operations further, Archibald said that he did not want to talk about it over the phone; they could talk about it in person. At that point, according to Archibald, Schonton had not threatened him. Still he did not contact any law enforcement agency at the outset. Although he was free to call a myriad of agencies outside of the MPD, including the FBI, the Florida Department of Law

28

Enforcement ("FDLE"), the U.S. Drug Enforcement Administration ("DEA"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Miami-Dade State Attorney's office, and the U.S. Attorney's Office for the Southern District of Florida, he did none of that.

Archibald did not speak to Schonton for about a week after September 28 and by his own account, nobody apparently threatened him during that time. Again, he did not report what had occurred to anyone. On October 8, Archibald texted Schonton to ask her to fill in for him at work so he could drop off his daughter at school. The two referred to each other as "love" and "hun." Sometime before October 11, Archibald testified that he spoke with Schonton in person and told her that he did not want to be involved anymore. He testified Schonton told him that if he tried to remove himself from the scheme, either she or someone else would make him "disappear." Still again he did not contact any law enforcement authority between the time of the conversation and the consummation of the October 11 operation. See Sixty Acres, 930 F.2d at 861 & n.2.

On October 11, Anderson, Kelvin, and Archibald met at Schonton's house; Archibald was late. Despite knowing that the participants were waiting for him, Archibald did not contact anyone in law enforcement. Nor during the course of the operations, at the marina and in the hotels, did Archibald make any effort to

29

contact law enforcement, although he was left alone more than once as the events transpired.

Archibald passed on that night's dinner, texting Schonton at 10:29 PM that he would meet her later at her home. While everyone but him was at dinner, he made no effort to contact any law enforcement agency. At 10:32 PM, however, he asked his wife what size shoes she wore. Around midnight, long after the dinner had passed, Archibald went to Schonton's house, where Anderson paid him $4,000. After that meeting, Archibald and Schonton did not communicate again. However, he made no effort to contact any of the authorities in the twelve days between the last operation and his arrest on October 23, 2018. Nor did Archibald take any step to withdraw from the conspiracy between October 11 and October 23.

Beyond having many opportunities to "escape or inform the police," Archibald's testimony and post-arrest interview contradict his claim that he could not report any of this because of Schonton's threats. On cross-examination, Archibald conceded he told the FBI that Schonton was trafficking drugs during his post-arrest interview, despite her alleged threat to "keep [his] lips sealed." In fact, Archibald conceded that he knew he had the option of going to the Internal Affairs ("IA") division of the MPD any time after September 28, but chose not to do so. Indeed, in a post-arrest statement, he acknowledged that he contemplated going to

30

IA because "I knew later on it would catch up. . . . 'Cause everything in the dark always comes to light." In any event, the jury was free to discredit Archibald's account after watching him testify.

Despite Archibald's attempts to characterize himself as a rookie police officer, it's also worth noting that he had two and a half years on the job as an MPD officer, and again, even if we accept that he believed that he could not go to IA because he feared that the entire department was corrupt, that does not explain why he could not have reported these crimes to a different law enforcement agency. At trial, many witnesses testified about the other options Archibald had, like filing a complaint with the FBI or going to the FDLE, the DEA, or ATF. Or, again, he could've gone to the Miami-Dade State Attorney's office or the U.S. Attorney's Office for the Southern District of Florida. See Amede, 977 F.3d at 1103 (holding that a "subjective and general lack of faith in law enforcement, with no supporting evidence, is insufficient"); United States v. Colacurcio, 659 F.2d 684, 690 (5th Cir. 1981) ("In the present case there were legal alternatives available: the matter could have been reported to the Internal Affairs Division of the New Orleans Police Department, to the district attorney, or to the United States attorney."). On this record, we can find no error in the district court's refusal to give a duress instruction.

31

**V.**

We are also unpersuaded by Kelvin's claim that the district court erred in not dismissing the indictment <u>sua sponte</u>, because Anderson purportedly testified falsely in the grand jury and because the prosecutor knowingly failed to correct her errors.[7]  Kelvin concedes, as he must, that we are required to review this claim for plain error because he never raised it in district court.  <u>See United States v. Flanders</u>, 752 F.3d 1317, 1332–33 (11th Cir. 2014).

"[D]ismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be infrequently utilized."  <u>United States v. O'Keefe</u>, 825 F.2d 314, 318 (11th Cir. 1987) (quotations omitted).  "[T]o establish prosecutorial misconduct for the use of false testimony, a defendant must show that the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony, and that the falsehood was material."  <u>United States v. Cavallo</u>, 790 F.3d 1202, 1219 (11th Cir. 2015).  "When the alleged prosecutorial misconduct occurs in the context of a grand jury proceeding, we dismiss the indictment only when the misconduct substantially influenced the grand jury's decision to indict or when there is grave doubt that the decision to

---

[7] Although Archibald adopts Kelvin's brief on this issue, none of the asserted testimonial errors related to his conduct.

indict was free from the substantial influence of such violations." Id. (quotations omitted).

The first error cited involves Anderson's grand jury testimony that on September 28, Kelvin took possession of one of the suitcases at the Greyhound bus station. At trial, Anderson said that Jamaal's car was already loaded when she and Kelvin got to the bus station. But reading the grand jury transcript in context, it appears the prosecutor did not ask Anderson about this sequence of events clearly during her grand jury testimony. Rather, the prosecutor asked, "And that is when you went to the Greyhound station and picked up two containers and you and Kelvin Harris went one direction to a hotel and James Archibald and Schonton Harris went to another direction to another hotel?" to which Anderson responded, "Yes." This does not come close to establishing perjury, let alone a prosecutorial effort to suborn perjury.

The second grand jury error purportedly occurred when Anderson said that on October 11, Kelvin was at the marina as the coolers arrived and he helped load the coolers into Schonton's car. At trial, however, Anderson said she and Kelvin accidentally passed the marina and arrived after Schonton and Archibald had already been there. In addition, Anderson testified that Kelvin assisted with unloading the coolers at the hotels, not with loading them at the marina. But not only did Kelvin's attorney repeatedly bring this inconsistency to the jury's

33

attention at trial, the error appears unintentional. During her grand jury testimony about the events on October 11, Anderson said at one point that she had gotten one of the lines of questioning "a little mixed up" because there were multiple operations, which made her "a little confused." None of this establishes prosecutorial misconduct.

Kelvin's third claimed error was not erroneous at all. Anderson testified before the grand jury that on October 11, Kelvin helped Schonton and Archibald remove the coolers from Schonton's car and take them to the hotels, and she testified to the same thing at trial.

All in all, we can find no perjury, let alone government misconduct.

## VI.

Kelvin and Archibald also argue that the prosecutor unconstitutionally struck an African American juror because of race. To determine whether a prosecutor has discriminated on the basis of race in exercising a peremptory challenge, Batson has established a three-step process: "First, the district court must determine whether the party challenging the strike[] has established a prima facie case by showing facts sufficient to support an inference of discriminatory motive." United States v. Hill, 643 F.3d 807, 837 (11th Cir. 2011). If a prima facie showing is made, "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two)." Purkett v. Elem, 514 U.S. 765, 767 (1995).

34

"The reason given for the peremptory strike need not be a good reason. It can be an irrational, 'silly or superstitious' reason, as long as it is not a discriminatory reason." Hill, 643 F.3d at 837 (quoting Purkett, 514 U.S. at 768). "In the third and final stage, the district court must evaluate the persuasiveness of the proffered reason and determine whether, considering all relevant circumstances, the objector has carried the burden of proving discrimination." Id.

Although we afford "great deference to the district court's finding" of a prima facie case of discrimination, we do not believe on this record that the defendants have even established a prima facie case. Cent. Alabama Fair Hous. Ctr., Inc. v. Lowder Realty Co., 236 F.3d 629, 635 (11th Cir. 2000) (quotations omitted); see also United States v. Ochoa-Vasquez, 428 F.3d 1015, 1039 (11th Cir. 2005).

Each of the parties reviewed in advance responses to questionnaires filed by 50 prospective jurors. After the parties excused 24 jurors for cause, four African American jurors remained in the jury pool. The government accepted three of them (Juror # 10, Juror # 22, Juror # 25) before it used its fourth peremptory challenge to strike Juror # 28. The final jury included two African Americans because Archibald struck Juror # 10.

In response to the government's peremptory strike against Juror # 28, Kelvin raised a Batson challenge because the juror was African American and counsel was

35

USCA11 Case: 19-13692    Date Filed: 08/09/2021    Page: 36 of 42

unaware of "anything that disqualifie[d] him." The government argued that the defense had not made a prima facie showing. When the court asked the prosecutor to provide a race-neutral reason for striking the juror, the prosecutor said he had a "gut feeling" about the juror and added that co-counsel had "reminded" him that Juror # 28 had "avoided eye contact" during voir dire. The defendants challenged the prosecutor's reasons as "pretextual." The court sought clarification, and the prosecutor repeated that Juror # 28 "was avoiding [the prosecutor's] gaze" during voir dire, which he thought "was unusual." The district court accepted the prosecutor's race-neutral reason.

Although the court did not say whether the defendants had made a prima facie showing of racial discrimination, we understand it to have implicitly found that the defendants made the showing because a district court cannot ignore this requirement. United States v. Campa, 529 F.3d 980, 998 (11th Cir. 2008); see Lowder, 236 F.3d at 636 ("[T]he establishment of a prima facie case is an absolute precondition to further inquiry into the motivation behind the challenged strike. . . . [A] district court may not require an explanation for a peremptory strike unless and until it satisfies itself that a prima facie case has been established."). The first question then is whether a prima facie case had even been made. Lowder, 236 F.3d at 636. "If the answer is no, then the inquiry ceases, and the challenge should

be denied." Id.; see also Campa, 529 F.3d at 998 ("We may affirm the decision of the district court on any ground that finds support in the record[.]").

Kelvin did not establish a prima facie case. He argues only that the juror was African American and he did not believe there was any reason to disqualify him other than race. However, we have already found similar facts to be insufficient to raise an inference of racial discrimination to meet the prima facie showing as a matter of law. Lowder, 236 F.3d at 636. We explained in Lowder that a trial court must consider all of the relevant circumstances, including the racial composition of the venire panel and the race of the other jurors struck. Id. at 636–37.

Here, the government only excluded one African American juror out of the seven peremptory challenges it made. It made no objection to the other three. See id. at 638 ("This Court has held that the unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a prima facie case of discrimination in the peremptory striking of jurors of that race."). Moreover, the final jury composition included two African American jurors out of twelve. In context, we do not believe the government's exercise of one of its peremptory strikes establishes a prima facie case. But even if we were to accept the district court's determination that the defendants established a prima facie case, we can find no error in the district court's ultimate determination, after having considered

37

all of the circumstances, that the defendants failed to carry their burden of proof.

The district court did not err in rejecting the Batson challenge.

**VII.**

Archibald, alone, also argues that the prosecution improperly shifted the

burden of proof to him during its case in chief and in closing argument.  Again

Archibald did not object in district court, so we may review this claim only for

plain error.  United States v. Frank, 599 F.3d 1221, 1238 (11th Cir. 2010).

"[P]rosecutors must refrain from making burden-shifting arguments which suggest

that the defendant has an obligation to produce any evidence or to prove

innocence."  United States v. Simon, 964 F.2d 1082, 1086 (11th Cir. 1992).

Archibald has not established plain error.  In fact, he has not shown any

error.  First, during cross-examination, Kelvin's attorney asked FBI Agent

Mercurio whether the authorities had any indication that Kelvin had committed or

was predisposed to commit any criminal offenses.  Mercurio responded that based

on the recordings, Schonton and Kelvin may have engaged in criminal activity in

the past.  On redirect, the prosecutor pursued this line of questioning, asking

Mercurio about Kelvin's recorded admission that he took $3,000 during an earlier

stash house raid.  When asked, Agent Mercurio said it would not be unusual for

police officers who committed past crimes to have no formal record.  Indeed, this

is why the FBI utilized sting operations to root out police corruption.  None of this

38

testimony (whether proper or not) in any way shifted the burden of proof from the government to Archibald.

Archibald also claims that the prosecutor committed misconduct during closing argument. After discussing Archibald's defense that he did not know what he was doing, and the concept of deliberate ignorance, the prosecutor observed that Archibald was a police officer and "the onus is on him to say this is not right." The government argued that if Archibald was not deliberately ignorant, he would have asked what he was doing before getting involved. Then, turning to the defendants' entrapment defense, the prosecutor focused on predisposition. She continued:

> [Y]ou heard some testimony about how big of a deal it is, right, for a police officer to break a rule, and it's that way for a reason. . . . And . . . for both of these gentlemen, who had wanted to be police officers since a young age, if somebody approached them and said hey, I want you to break this rule, it might result in a disciplinary action, suspension, relief of duty, you would think that the automatic response, unequivocally, would be no.

> So why is it . . . when they're provided with an opportunity to help drug dealers, that there isn't any hesitation? . . . In this case, we know that Archibald was ready and willing to participate because in days. Days, he agreed.

The prosecutor marshalled the evidence showing that Archibald quickly accepted the opportunity Schonton had offered.

As we see it, the prosecutor referenced Archibald's position as an MPD officer in order to explain why it was unlikely he did not know what he was doing.

39

The prosecutor also asked the jury to draw the inference that Archibald had been deliberately ignorant.  See Tucker v. Kemp, 762 F.2d 1496, 1506 (11th Cir. 1985).  The argument went to Archibald's willingness to engage in the charged crimes, and highlighted the speed with which he agreed to join the illegal enterprise.  It also highlighted how careful he was in hiding their activities.  Rutgerson, 822 F.3d at 1235.

We do not read this as an effort to shift the burden of proof to the defendants.  The prosecutor squarely said in closing argument and the district court expressly instructed the jury that the burden of proof rested with the government and the defendants were presumed innocent.  See United States v. Hernandez, 145 F.3d 1433, 1439 (11th Cir. 1998).  On the first day of the trial, the district court twice instructed the jury that the government bore the burden of proving the crimes charged beyond a reasonable doubt and that the defendants were presumed innocent.  During closing argument, the prosecutor acknowledged that, "Beyond a reasonable doubt, it is a very high burden and it's a burden that we accept."  And at the end of the case, the district court again instructed the jury to decide whether the government had proven the defendants' guilt beyond a reasonable doubt.  See United States v. Nerey, 877 F.3d 956, 972 (11th Cir. 2017) (finding no reversible prosecutorial misconduct in part because the district court issued curative

instructions, which the "jury is presumed to follow"). There was no error here, plain or otherwise.

**VIII.**

Finally, the defendants claim that the trial court fatally erred by failing to inform the jury that it was entitled to a read-back of Archibald's trial testimony in response to a note asking for the court reporter's transcript of Archibald's testimony. Instead, the court simply answered: "We do not have a transcript. Please rely on your recollection of his testimony." When the trial court told the lawyers what it proposed to say, Archibald's lawyer simply said, "Yes, Your Honor," and Kelvin's lawyer said nothing at all. Reviewing the matter for plain error, we can discern none.

A district court has "broad discretion" in responding to jury questions, including a request that evidence be reread. United States v. Delgado, 56 F.3d 1357, 1370 (11th Cir. 1995); McDonald, 935 F.2d at 1222. There was "no error in the trial court's failure to advise the jury sua sponte that, although no transcript had been prepared, the court reporter could read it portions of the testimony." United States v. Boyd, 54 F.3d 868, 872 (D.C. Cir. 1995) (noting that "[a] trial court enjoys broad discretion . . . especially in deciding whether to provide requested testimony [to the jury] either in written form, or as read by a court reporter" (citations omitted)).

In order to show plain error, the defendants must point to some precedent from the Supreme Court or our Court "directly resolving" the issue. United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003). There is none. They have not cited a precedential decision requiring a district court to advise the jury sua sponte that a read-back of testimony is available and we have been unable to find one.

Nor, in any event, has Kelvin shown any prejudice arising from the failure to read back Archibald's testimony. United States v. Pacchioli, 718 F.3d 1294, 1306 (11th Cir. 2013) (noting that a defendant must show prejudice resulting from the district court's failure to read back certain testimony).

At the end of the day, we can discern no reversible error and affirm the convictions of Kelvin and Archibald.[8]

**AFFIRMED.**

---

[8] Finally, at oral argument, Kelvin abandoned his written claim that the district court constructively amended the indictment by mistakenly citing the wrong counts while instructing the jury on the firearm-possession counts. We therefore do not address this matter. See AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc., 508 F.3d 995, 1003 (11th Cir. 2007) ("[The appellants] wisely abandoned this position at oral argument, so we need not address this issue further.").