**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-12899

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

NATHANIEL HILLIARD,

*Defendant-Appellant.*

————————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 3:20-cr-00024-TES-CHW-3

————————————————

Before NEWSOM, BRANCH, and BRASHER, Circuit Judges.

PER CURIAM:

2                        Opinion of the Court                    24-12899

Nathaniel Hilliard[1] appeals from his convictions and total 192-month sentence for distribution of heroin (3 counts), possession of a firearm by a convicted felon, and failure to appear at a pretrial conference.  He argues that (1) the district court violated his Sixth Amendment right to self-representation by denying his request to proceed *pro se* and appointing him counsel; (2) the district court violated his Sixth and Fifth Amendment rights and the rules of criminal procedure by removing him from the courtroom during his trial; (3) the evidence related to the possession of a firearm charge was insufficient to overcome his entrapment defense; (4) the district court violated his rights under the Confrontation Clause by preventing him from cross-examining a government witness, Glen Mitchell, regarding a criminal conviction; and (5) the district court erred in applying a sentencing enhancement under U.S.S.G. § 2K2.1(b)(6), and his sentence is substantively unreasonable.  After careful review, we affirm.

## I.    Background

In 2020, a grand jury indicted Hilliard, among others, for three counts of distributing heroin on three separate occasions in May 2016, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and for possessing a firearm as a convicted felon, in violation of 18 U.S.C.

---

[1] We note that, during the district court proceedings, Hilliard repeatedly insisted that he was not Hilliard and that his name was "Nathaniel Hilliard El-Bey."  As a result, the government amended the superseding indictment to add "Nathaniel Lee Hilliard El-Bey" as an a.k.a. for Hilliard.  For purposes of this opinion, we use Hilliard, which is the name under which the case was docketed.

§§ 922(g)(1), 924(a)(2) (Count Eight).  Thereafter, when Hilliard failed to appear for a pretrial conference, the district court issued a bench warrant for his arrest.  Following Hilliard's arrest, the government obtained a superseding indictment that added a charge for failure to appear at the pretrial conference, in violation of 18 U.S.C. § 3146(a)(1).

During a subsequent pretrial hearing, Hilliard stated that he was "not the [d]efendant, life, flesh, blood, being, making a special appearance."  He stated that he had submitted documents establishing that "Hilliard [was his] property," and as "the owner of Hilliard, [he was] the only one able to speak for him," not his court-appointed lawyer.  Hilliard also explained that he was challenging the court's jurisdiction and authority to prosecute him.  Hilliard's court-appointed counsel clarified that, earlier that morning, Hilliard advised him that he did not want counsel's services.  Hilliard confirmed "Yeah.  I'm not his client.  As I stated before, Hilliard is my property and I'm the only one authorized to represent him."  The district court asked Hilliard whether he was telling the court that he wanted to proceed *pro se*, and Hilliard stated "No.  I don't want to proceed any way.  I want the [c]ourt to prove status of jurisdiction before proceeding forward."  The district court then attempted to explain some procedural matters to Hilliard, and he repeatedly interrupted the court and questioned the court's authority and insisted that he was not Hilliard and was "not the one on trial."

The district court then attempted to conduct a *Faretta*[2] inquiry to determine whether Hilliard was knowingly, intelligently, and voluntarily waiving his right to counsel. However, Hilliard refused to respond to the court's questions. For instance, Hilliard did not respond to the court's questions as to whether he understood that (1) if he represented himself, he would be assuming full responsibility for his defense; (2) he was not entitled to special treatment if he represented himself; and (3) the court could not advise him how to try his case. Then in response to whether he understood that he "must follow all the technical rules," Hilliard stated, "I don't understand any of these questions." Similarly, he refused to respond to the court's questions regarding his age, his education, and his ability to read and write.

Nevertheless, the district court continued with the *Faretta* inquiry and explained at length what would be involved if Hilliard proceeded *pro se*, the risks of self-representation, and the benefits of having counsel. During this colloquy, Hilliard continued to interrupt the court and insisted that he was not going to trial. The court concluded that Hilliard had not knowingly and intelligently waived his right to counsel and had not shown that he was "willing to abide by rules of procedure and courtroom protocol." Accordingly, the district court concluded that he could not proceed

---

[2] *Faretta v. California*, 422 U.S. 806 (1975) (holding that a defendant has a constitutional right to self-representation when he voluntarily and intelligently elects to do so).

*pro se* and would continue to be represented by court-appointed counsel.

The district court warned Hilliard that "if he continue[d] to conduct himself in a disorderly, disruptive, and disrespectful manner," the court could remove him from the proceedings. The court explained that "speaking out, cutting off the [c]ourt, cutting off the prosecutor, [and] cutting off your attorney" were all forms of disruptive behavior for which the court could remove him from the trial if he continued to engage in such behavior. The court explained, however, that even if it removed Hilliard, if he decided to cooperate and not engage in disruptive behavior, then he would be allowed to come back to the courtroom.

On the morning of the trial, Hilliard's counsel informed the court that Hilliard did not want to sit at the defense table. The district court explained that it had previously conducted a *Faretta* inquiry, but because Hilliard refused to respond to questions, it did not have the information necessary to allow Hilliard to represent himself. As a result, the court had appointed counsel. The court offered to conduct another *Faretta* inquiry if desired and noted that it did not understand Hilliard's position other than that he did not want to sit at the defense table. Hilliard stated, "I come in my proper person. I am propria persona, in my proper person. Like I stated, [counsel], he can't—I'm the authorized representative for Nathaniel Hilliard El-Bey." The district court explained that it understood Hilliard did not want counsel, but it could not allow Hilliard to represent himself because it could not determine that he

6                    Opinion of the Court                    24-12899

had knowingly and intelligently waived the right to counsel. The court offered to conduct another *Faretta* inquiry and explained that a sovereign citizen argument was not a defense.

Hilliard then proceeded to question the district court judge, asking him to state his status, name, and nationality for the record. Hilliard then stated that the judge was not authorized to sit on the bench because he was not "in [his] proper person," and asked the prosecutor to "give their status on the record." The district court instructed Hilliard to not interrupt the court and warned Hilliard that if he continued to be disruptive, the court would remove him from the trial. Hilliard continued to insist that the prosecutor state his status, name, and nationality, despite the court's instruction that it was "not going through that." The district court then stated that Hilliard was "being obstructive" and it would order him removed until he "agree[d] that [he could] come in and conduct [himself]" in an appropriate manner. The court inquired as to whether Hilliard would "cooperate with the [c]ourt," and Hilliard refused to respond. Accordingly, the court removed Hilliard to another room with a video feed where he could see and hear the trial.

After discussion of some procedural matters with counsel, the district court again gave Hilliard an opportunity to return to the courtroom. Specifically, the district court had Hilliard's counsel go to Hilliard and explain that the court's preference was that Hilliard be present and all he had to do was abide by the processes and rules of the court, and that "the [c]ourt was seeking

24-12899                Opinion of the Court                7

an answer from [Hilliard] as to whether he wanted to be [present] or not." Hilliard, however, refused to respond to counsel. Accordingly, the district court explained that the trial would proceed, but it instructed counsel to check with Hilliard at every break to see if he had changed his mind and wanted to come back. The court also offered to provide Hilliard with a pen and paper so that he could write notes and communicate with his counsel during the trial. However, Hilliard refused the pen and paper and refused another effort by his counsel to get him to agree to cooperate and return to the courtroom. Accordingly, the trial proceeded without Hilliard present.[3]

Prior to the start of the trial, the government objected to the defense cross-examining one of the confidential informants in this case, Glen Mitchell, "about the underlying facts of his prior conviction under [Federal Rule of Evidence] 609,[4]" arguing that it

---

[3] The record confirms that, at various points during the trial, Hilliard's counsel checked on Hilliard and asked if he had changed his mind and wanted to be present in the courtroom, but he was non-responsive each time.

[4] Rule 609 governs impeachment evidence based on a criminal conviction and provides as follows:

> (a) **In General.** The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:

> (1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:

constituted improper impeachment. The defense argued that "this goes well beyond Rule 609," and that Mitchell had a prior conviction for impersonating a federal law enforcement agent, which went "directly to his motivation for being involved in a case like this, wanting to be paid, which is what he basically was convicted of in his earlier case, was seeking to be paid to help somebody with a federal prosecution as a federal law enforcement agent." The government then pointed out that the conviction in question was 18 years old. After reviewing the conviction, the court concluded that it was inadmissible because it was more than 10 years old.

Mitchell testified that he was a confidential informant for the FBI between 2015 and 2016 in Athens, Georgia. During this time,

---

> (A) must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant; and
>
> . . . .
>
> (b) **Limit on Using the Evidence After 10 Years.** This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:
>
>> (1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and
>>
>> (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

24-12899                 Opinion of the Court                      9

he assisted the FBI with investigating a drug operation involving the Rolling Ridge apartment complex in Athens.  From May 19, 2016, to May 25, 2016, Mitchell recorded 12 phone conversations and 3 in-person interactions with Hilliard on May 23, 24, and 25.  The government submitted those recordings into evidence and played several of the recordings for the jury.

In a phone call from May 22, 2016, Mitchell asks Hilliard to provide him with "four points"[5] (*i.e.*, heroin) the next day, and Hilliard agreed.  Mitchell then asked Hilliard "did you look after that thing for me too, you never did give me no ticket on it," and Hilliard stated, "oh, yea, I can do that now, you still want that?"[6] Mitchell confirmed that he still wanted it and would like to get it the next day as well.  Mitchell again stated that Hilliard had not given him a "ticket," and when Hilliard asked, "on what," Mitchell stated, "on the gun, you didn't give me the price."

The next day, May 23, Mitchell called Hilliard to tell him what time he would be coming by, and asked Hilliard if he was going to let Mitchell get "the hammer too" (*i.e.*, the gun).  Hilliard stated that he "had them things [that] morning" for Mitchell, but Hilliard had been unable to reach Mitchell, despite calling multiple times.  Hilliard explained that he did not have anywhere "to hold

---

[5] Mitchell testified that a "point" is a measure of heroin.

[6] Mitchell testified that he was asking Hilliard for a gun and that "ticket" is a slang word for "price."

them things like that," so he no longer had it. Hilliard stated he would "try" to have that ready for Mitchell when he arrived.

Later that day, Mitchell and another confidential informant, Ron Bostwick, met Hilliard at the Rolling Ridge apartments. During this encounter, Hilliard sold Mitchell heroin. Hilliard also stated that if they wanted "the strap" (*i.e.*, the gun), he would have "to come to [them] later because every time he called," Mitchell did not answer. Hilliard explained that, if he repeatedly called Mitchell, then Mitchell needed to answer. As he was leaving, Mitchell reiterated that he needed a gun, and Hilliard stated, "I got you" and reminded Mitchell to answer the phone. Hilliard again sold heroin to Mitchell on May 24.

In additional audio recordings from May 23, May 24, and May 25, 2016, Mitchell and Hilliard discussed Hilliard procuring a gun, and Hilliard agreed. During the May 25th call, Hilliard asked Mitchell if he wants some "more" (referring to heroin), and Mitchell stated that he "was gonna get some more," but not without "that thing" (*i.e.*, the gun). And Hillard stated that he "was going to get on that now."

Later in the day on May 25, Hilliard called Mitchell and stated that he had found a man who had a "Taurus," but he wanted "300" for it. Mitchell asked Hilliard if he and the man could bring the Taurus to Mitchell if he bought it, and Hilliard stated the man was not willing to do that. In response, Mitchell stated, "Oh well, then fuck it then." In response, Hilliard stated that all Mitchell had to do was "look at it." Mitchell then complained that he did not

want to have to go get the gun, and Hilliard stated that Mitchell did not have to go get it.  Rather, they could make it part of their next deal.  Mitchell agreed, and they discussed how much "dope" Mitchell would get in the next deal along with the gun.

Mitchell and Bostwick met Hilliard the afternoon of May 25, and purchased heroin and the gun.  Specifically, they met Hilliard at a gas station, and Hilliard entered Mitchell's car and explained that the person he was buying the gun from wanted the money first.  Mitchell refused at first, and Hilliard offered to leave his "grill"[7] with them as collateral, while he took the money and got the gun.  Mitchell agreed, and Hilliard exited the car.  A few minutes later, Hilliard returned with the gun.  Mitchell then drove himself, Bostwick, and Hillard to another gas station to get the heroin.  Upon arriving at the second gas station, Hilliard exited the vehicle and left to go get the heroin, again leaving his "grill" with Mitchell and Bostwick as collateral.  When Hilliard did not come back after several minutes, Mitchell and Bostwick drove to the nearby Rolling Ridge apartments to find Hilliard.  They observed Hilliard as they pulled into the complex, and Hillard got in their car and gave them the heroin.

On cross-examination, Mitchell explained that he had been working as a confidential informant with the FBI since at least 2013.  He was paid approximately $400 for each transaction he completed.  He did not receive any money if the deal was not

---

[7] A "grill" is "permanent or removable mouth jewelry." *Smith v. Cain*, 565 U.S. 73, 79 n.2 (2012) (Thomas, J., dissenting).

completed. Mitchell confirmed that he initiated the topic of Hillard getting him a gun, not Hilliard. He also confirmed that he told Hilliard that he would not buy anymore heroin unless he got a gun. And that the FBI never told him to "stop pushing for a firearm." However, Mitchell also testified that Hilliard never once protested the gun request or said anything like "I'm not in that business" or that he could not do that. Rather, Hilliard told Mitchell that "as soon as he get[s]" a firearm, "he gets rid of them right away," and that was why Hilliard kept harassing Mitchell about answering the phone.

Bostwick, the other confidential informant, testified similarly to Mitchell concerning the transaction with Hilliard. Specifically, he confirmed that they purchased heroin from Hilliard on three occasions and that they also purchased a gun on May 25. The FBI only paid Bostwick if the transaction was completed, and he could not remember exactly how much he was paid, but he confirmed that at most it was $400. Bostwick did not communicate with Hilliard directly or negotiate the transactions because Mitchell was the point of contact.

The parties stipulated that Hilliard was a convicted felon and that he was aware of his status as a convicted felon. The district court instructed the jury on the defense of entrapment only for the possession of a firearm by a convicted felon charge. During deliberations, the jury requested for the court to replay calls and videos that involved the firearm, which the court did. The jury convicted Hilliard as charged.

Prior to sentencing, the United States Probation Office prepared a presentence investigation report.  As part of the guidelines calculation the probation officer applied a four-level enhancement for possession of a firearm in connection with another felony offense, under U.S.S.G. § 2K2.1(b)(6)(B).  With a total offense level of 28 and a criminal history category of IV,[8] Hilliard's advisory guidelines range was 110 to 137 months' imprisonment.  He faced a statutory maximum of 40 years' imprisonment (if the court imposed consecutive sentences).

Hilliard raised various objections to the PSI, including, as relevant here, that the § 2K2.1(b)(6)(B) enhancement was inapplicable because the firearm was not connected to the heroin sale, as evidenced by the following: (1) the gun and drug sale occurred at different locations on the same day; (2) the heroin and the gun were not possessed at the same time or within close proximity to each other; and (3) the gun did not facilitate the drug transaction.  The probation office maintained that there was a clear nexus between the gun and the heroin because the sales happened the same day within minutes of each other and Hilliard entered the vehicle with the heroin while the firearm was also in the vehicle to complete the heroin transaction.

---

[8] Hilliard had several prior convictions, including conspiracy to commit robbery with a dangerous weapon, assault on a female; and assault by strangulation.

At sentencing,[9] after hearing arguments from both parties as to the § 2K2.1(b)(6)(B) enhancement, the district court overruled Hilliard's objection, noting that the gun and heroin were in very close proximity and had a close connection. The government requested an unspecified upward variance from the guidelines range based on Hilliard's continued disrespect for the court and the judicial system. Hilliard's counsel requested a within-guidelines sentence. The district court explained that, after considering the guidelines range and the 18 U.S.C. § 3553(a) sentencing factors, an upward variance was appropriate based on Hilliard's history and personal characteristics, the serious nature of the offenses, and because the guideline range underrepresented Hilliard's criminal history, which included violent convictions for assault. Accordingly, the district court imposed a total sentence of 192 months' imprisonment to be followed by three years' supervised release. Hilliard's counsel objected to the upward variance. This appeal followed.

## II.    Discussion

Hilliard argues that (1) the district court violated his Sixth Amendment right to self-representation by denying his request to proceed *pro se* and appointing him counsel; (2) the district court

---

[9] At sentencing, Hilliard continued to be disruptive, repeatedly interrupted the proceedings, and refused to abide by the court's rules. Accordingly, after repeated warnings from the court, he was removed from the sentencing proceedings. The court attempted to return Hilliard to the courtroom before imposing sentence, and he refused to respond and refused to come back.

violated his Sixth and Fifth Amendment rights and the rules of criminal procedure by removing him from the courtroom during his trial; (3) the evidence related to the possession of a firearm charge was insufficient to overcome his entrapment defense; (4) the district court violated his rights under the Confrontation Clause by preventing him from cross-examining Mitchell regarding a criminal conviction; and (5) the district court erred in applying a sentencing enhancement under U.S.S.G. § 2K2.1(b)(6), and his sentence is substantively unreasonable.   We address each argument in turn.

### A.  Self-representation Claim

Hilliard argues that the district court violated his Sixth Amendment right to represent himself at trial by appointing him counsel.  He maintains that all of the relevant factors a court should consider support the conclusion that he should have been able to represent himself—namely, he was 37 with some college education and there was no indication that he did not understand what he was doing or the risks of proceeding *pro se*.

Although the Sixth Amendment guarantees a criminal defendant the right to counsel, it also grants him the right to self-representation.  *Faretta*, 422 U.S. at 819–20.  However, in order to represent himself, a defendant must "knowingly and intelligently" waive his right to counsel.  *See id.* at 835 (quotations omitted).  "The ideal method of assuring a voluntary waiver is for the trial judge to conduct a pre-trial hearing at which the defendant would be informed of the charges, basic trial procedures, and the

hazards of self-representation." *Strozier v. Newsome*, 926 F.2d 1100, 1104 (11th Cir. 1991). Nevertheless, we have recognized that, when faced with a defendant who rejects his counsel but is also uncooperative with the court, many times "[a] dialogue cannot be forced." *United States v. Garey*, 540 F.3d 1253, 1267 (11th Cir. 2008) (en banc). Thus, when a defendant

> refuses to provide clear answers to questions regarding his Sixth Amendment rights, it is enough for the court to inform the defendant unambiguously of the penalties he faces if convicted and to provide him with a general sense of the challenges he is likely to confront as a pro se litigant. So long as the trial court is assured the defendant (1) understands the choices before him, (2) knows the potential dangers of proceeding pro se, and (3) has rejected the lawyer to whom he is constitutionally entitled, the court may, in the exercise of its discretion, discharge counsel or (preferably, as occurred here) provide for counsel to remain in a standby capacity.

*Id.*

However, we have cautioned that "[t]he right to self-representation, though deeply rooted, is not absolute." *United States v. Butler*, 117 F.4th 1309, 1316 (11th Cir. 2024). Rather, the right "presupposes a cooperative defendant willing to engage in reciprocal dialogue with the court." *Id.* (alteration adopted) (quotations omitted). "[T]he right is not a license to abuse the dignity of the courtroom" or "a license not to comply with relevant rules of procedural and substantive law." *Id.* (quotations omitted).

24-12899               Opinion of the Court                    17

Thus, even where a court has granted a defendant the right to self-representation, the court "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Id.* (quotations omitted). We review the district court's decision *de novo*. *Id.*

Here, the district court did not err in denying Hilliard's request to proceed *pro se* and instead appointing counsel to represent Hilliard. Hilliard failed to respond to the district court's *Faretta* inquiry, and the only answer he did provide was that he "[did not] understand any of these questions." Thus, the trial court was not assured that Hilliard understood the choice he was making or the dangers of proceeding *pro se*, which is a necessary requirement before a court will find a knowing and intelligent waiver of counsel. *See Garey*, 540 F.3d at 1267 (en banc) (explaining that the court may allow an uncooperative defendant to proceed *pro se* provided the "court is assured the defendant (1) understands the choices before him, (2) knows the potential dangers of proceeding pro se"). Furthermore, Hilliard's repeated misconduct and defiance of the court demonstrated that he was not willing to engage with the court or abide by the procedures and the law. Hilliard repeatedly interrupted the court, failed to follow the court's directives, questioned the court's authority, and insisted that he was not the defendant and was not going to trial. Under these circumstances, the district court did not err in denying his request for self-representation. *Butler*, 117 F.4th at 1316. Accordingly, Hilliard is not entitled to relief on this claim.

18                    Opinion of the Court                    24-12899

### B. Removal from the Courtroom Claim

Hilliard argues that the district court violated his Fifth and Sixth Amendment rights and Federal Rule of Criminal Procedure 43 by excluding him from the courtroom during the trial. He maintains that his conduct was not so disruptive as to justify his removal and that his removal prevented him from meaningfully participating in his trial.

"The right of a criminal defendant to be present at trial has three bases: the Confrontation Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and Federal Rule of Criminal Procedure 43." *United States v. Novaton*, 271 F.3d 968, 997 (11th Cir. 2001). Indeed, "the right of a criminal defendant to be present at all critical stages of his trial is a fundamental constitutional right." *Id.* at 998 (alteration adopted) (quotations omitted)). However, this right is not absolute. *Illinois v. Allen*, 397 U.S. 337, 342–43 (1970).

> [A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.

*Id.* at 343; *see also United States v. Beasley*, 72 F.3d 1518, 1530 (11th Cir. 1996) (explaining that a court can remove a disruptive defendant provided that the district court warns the defendant that his behavior may result in his removal). Disruptive behavior

includes behavior that delays the trial proceedings, such as repeatedly interrupting the district court and "provid[ing] nonresponsive answers to the court's questions." *See United States v. Sterling*, 738 F.3d 228, 237 (11th Cir. 2013). "[W]e give great deference to the district court's decision that exclusion was necessary." *Beasley*, 72 F.3d at 1530. "Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." *Allen*, 397 U.S. at 343.

"When reviewing a district court's decision to proceed with trial in a defendant's absence, we first review whether the district court properly exercised its discretion in finding that the defendant voluntarily waived the right to be present." *United States v. Bradford*, 237 F.3d 1306, 1311 (11th Cir. 2001).

> [W]e review a district court's factual findings as to whether the defendant's absence is voluntary for clear error. If the court properly found the right waived, we consider whether the court abused its discretion in concluding that there was on balance a controlling public interest to continue the trial in the defendant's absence.

*Id.*

Here, the district court did not err in finding that Hilliard waived his right to be present during his trial by engaging in repeated disruptive behavior, despite the court's warnings on more than one occasion that, if he continued being disruptive, he would

20                    Opinion of the Court                    24-12899

be removed.  *See Beasley*, 72 F.3d at 1530; *see also Sterling*, 738 F.3d at 233, 237.  Furthermore, the district court did not abuse its discretion in continuing the trial in Hilliard's absence.  Hilliard repeatedly interrupted the court proceedings, asserted that he was not the defendant and was not going to trial, and questioned the court's authority to prosecute him.  Given his behavior, there was no reason for the trial court to believe that the trial would be able to continue with Hilliard present.[10]  *See Sterling*, 738 F.3d at 237 (concluding that the district court did not abuse its discretion in proceeding with the trial outside of the presence of the defendant based on similar disruptive behavior); *see also Bradford*, 237 F.3d at 1314 (stating that "the defendant's contumacious conduct . . . may support a district court's decision to proceed with trial" in the defendant's absence).  Accordingly, we conclude that the district court did not err in removing Hilliard from the trial or abuse its discretion in continuing the trial in his absence.

## C.  *Entrapment Defense*

Hilliard argues that the evidence related to the possession of a firearm by a convicted felon charge was insufficient to overcome his entrapment defense because the evidence did not support the

---

[10] We note that the district court took many steps to preserve Hilliard's right to participate in the trial proceedings, including by setting up a video feed so he could see and hear the proceedings; offering him a pen and paper so he could communicate with counsel (which he refused); and repeatedly checking to see if Hilliard would agree to abide by the court rules and if he wanted to return to the proceedings (to which Hilliard was non-responsive).  It is unclear what more the court could have done to preserve Hilliard's rights.

conclusion that he was predisposed to possess a firearm. Instead, he maintains that he possessed a firearm only because Mitchell initiated the purchase and continued to repeatedly push the issue.

"Entrapment is an affirmative defense that requires (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to commit the crime before the inducement." *United States v. Harris*, 7 F.4th 1276, 1289 (11th Cir. 2021) (quotations omitted). When, as here, "an entrapment defense is rejected by the jury, our review is limited to deciding whether the evidence was sufficient for a reasonable jury to conclude that the defendant was predisposed to take part in the illicit transaction." *United States v. Brown*, 43 F.3d 618, 622 (11th Cir. 1995). We review the sufficiency of the evidence "*de novo*, viewing the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility evaluations in favor of the jury's verdict." *United States v. Haile*, 685 F.3d 1211, 1219 (11th Cir. 2012). The "jury's verdict cannot be overturned if any reasonable construction of the evidence would allow the jury to find the defendant guilty beyond a reasonable doubt." *Brown*, 43 F.3d at 622.

"Predisposition is a fact-intensive and subjective inquiry, requiring the jury to consider the defendant's readiness and willingness to engage in the charged crime absent any contact with the government's agents." *Harris*, 7 F.4th at 1290 (quotations omitted). In other words, the predisposition element "focuses upon whether the defendant was an unwary innocent or, instead,

an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Id.* (quotations omitted). There is no set list of factors that must be considered to determine predisposition. *United States v. Isnadin*, 742 F.3d 1278, 1298 (11th Cir. 2014). Instead, "[p]redisposition may be demonstrated simply by a defendant's ready commission of the charged crime. A predisposition finding is also supported by evidence that the defendant was given opportunities to back out of illegal transactions but failed to do so." *Id.* (citation and quotations omitted).

Here, viewed in the light most favorable to the government, there was sufficient evidence from which a jury could have reasonably inferred Hilliard's predisposition to possess a gun as a convicted felon. Specifically, the evidence established Hilliard knew he was a felon, and that although Mitchell initiated the conversation about needing a gun, Hilliard willingly discussed it in multiple conversations and voluntarily agreed to get a gun for Mitchell. Hillard then got a gun for Mitchell and tried to call him multiple times, but when Mitchell failed to answer his calls, Hillard stated that he gave the gun to someone else. Furthermore, there was no evidence that Hilliard objected or tried to back out despite having opportunities to do so. And when Mitchell said "fuck it" to the offer to buy the Taurus because he did not want to have to go and get the gun, Hilliard responded by encouraging him to take a look at it, and offering to get the gun for Mitchell and make it part of their next drug transaction. Accordingly, we conclude that this evidence was sufficient for the jury to find that Hilliard had the

necessary predisposition and reject his entrapment defense. *See Isnadin*, 742 F.3d at 1298; *Haile*, 685 F.3d at 1219.

### D. Confrontation Clause Claim

Hilliard argues that the district court violated his rights under the Confrontation Clause by preventing him from cross-examining Mitchell about his 18-year-old criminal conviction for impersonating a federal law enforcement agent. He maintains that the conviction information was critical to the jury's assessment of Mitchell's credibility and motives as a paid informant, and that had the jury known about Mitchell's conviction, it would have undermined any conclusion that Hilliard was predisposed to possess a firearm.

"[T]he right of confrontation guaranteed by the Sixth Amendment includes the right of cross-examination." *United States v. Jeri*, 869 F.3d 1247, 1262 (11th Cir. 2017) (quotations omitted). "A central function of the Sixth Amendment right to cross-examination is to expose the witness' motivation in testifying." *United States v. Garcia*, 13 F.3d 1464, 1468 (11th Cir. 1994). "Full cross-examination by defense counsel is especially critical when the witness sought to be questioned is the chief government witness." *Id.*

Nevertheless, the right to cross-examination "is not without limitation." *Jeri*, 869 F.3d at 1262 (quotations omitted). A defendant "is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.*

(quotations omitted). The district court retains the "discretionary authority to rule on the admissibility of evidence, including the power to limit cross-examination." *Garcia*, 13 F.3d at 1468. "A defendant's confrontation rights are satisfied when the cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witness and enables defense counsel to establish a record from which he properly can argue why the witness is less than reliable." *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1371 (11th Cir. 1994); *see also United States v. Barrington*, 648 F.3d 1178, 1188 (11th Cir. 2011) ("As long as sufficient information is elicited from the witness from which the jury can adequately assess possible motive or bias, the Sixth Amendment is satisfied." (quotations omitted)).

We review a "claim that the district court improperly limited the scope of . . . cross-examination for a clear abuse of discretion."[11] *United States v. Maxwell*, 579 F.3d 1282, 1295 (11th Cir. 2009). Similarly, we review the district court's decision regarding the admissibility of prior convictions under Federal Rule

---

[11] We note that Hilliard did not mention the Confrontation Clause when arguing that he should have been permitted to cross-examine Mitchell concerning the prior conviction under Federal Rule of Evidence 609. However, his argument did concern effective cross-examination, he stated that the issue went "well beyond Rule 609," and the government does not argue that he failed to properly preserve the Confrontation Clause challenge. Accordingly, we assume, arguendo, that his objection was sufficient to preserve his Confrontation Clause claim, and we review the claim for abuse of discretion as opposed to plain error.

of Evidence 609 for abuse of discretion. *United States v. Pritchard*, 973 F.2d 905, 908 (11th Cir. 1992).

Federal Rule of Evidence 609 applies when a party seeks to use a prior conviction to attack "a witness's character for truthfulness." Fed. R. Evid. 609(a). However, Rule 609(b) provides that evidence of a conviction that is more than 10 years old "is admissible only if," after giving proper notice of a party's intent to use it, the court determines that the evidence's probative value "substantially outweighs its prejudicial effect." *Id*. R. 609(b); *see also United States v. Cathey*, 591 F.2d 268, 275 (5th Cir. 1979)[12] ("Rule 609(b) makes over-age convictions inadmissible unless the court makes the required finding of probative value."). Indeed, "[i]n this circuit, there is a presumption against the use of prior crime impeachment evidence over ten years old; such convictions will be admitted very rarely and only in exceptional circumstances." *Pritchard*, 973 F.2d at 908 (quotations omitted).

Here, the district court did not abuse its discretion in excluding Mitchell's 18-year-old conviction under Rule 609 and limiting Hilliard's cross-examination on this topic. The conviction was presumptively inadmissible under Rule 609(b), and Hilliard did not establish that the conviction's probative value would have substantially outweighed its prejudicial effect. Furthermore, the jury was exposed to facts that were sufficient for them to evaluate

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Mitchell's credibility and motives. For instance, defense counsel elicited information from Mitchell that he was a paid informant and that he was only paid if a transaction was completed, which went to his motive in this case. Additionally, Mitchell admitted that he was the one who initiated discussions about needing a gun, not Hilliard. Mitchell also confirmed that he told Hilliard that he would not buy any more heroin unless he got a gun. This information allowed the jury to independently assess whether Mitchell unduly influenced or pressured Hilliard into getting a gun. Furthermore, Hilliard's counsel argued extensively in closing that Mitchell was biased and not credible, and that Hilliard was entrapped. Moreover, the audio and video evidence of the calls and transactions with Hilliard enabled the jury to judge Mitchell's credibility and his truthfulness. Accordingly, Hilliard's confrontation rights were satisfied. *See Baptista-Rodriguez*, 17 F.3d at 1371; *Barrington*, 648 F.3d at 1188.

### E. Sentencing Challenges

Hilliard argues that (i) the district court erred in applying a four-level enhancement under U.S.S.G. § 2K2.1(b)(6) based on the possession of the gun in connection with the heroin sale, and (ii) his sentence, which was an upward variance from the guidelines, is substantively unreasonable because the district court placed too much weight on information that was already accounted for in the guidelines calculation. We first address his challenge to the U.S.S.G. § 2K2.1(b)(6) enhancement. We then address his substantive reasonableness challenge.

> i.    The § 2K2.1(b)(6) enhancement

"We review the interpretation and application of the Sentencing Guidelines *de novo*, and we review underlying findings of fact for clear error.  The determination that a defendant possessed a firearm 'in connection with' another felony is a finding of fact." *United States v. Jackson*, 997 F.3d 1138, 1140 (11th Cir. 2021) (citation omitted).  "For a factual finding to be clearly erroneous, this court, after reviewing all of the evidence, must be left with a definite and firm conviction that a mistake has been committed." *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1137 (11th Cir. 2004) (quotations omitted).

The guidelines provide for a four-level enhancement if the defendant "used or possessed any firearm . . . in connection with another felony offense."  U.S.S.G. § 2K2.1(b)(6)(B).  A defendant possesses a gun in connection with a drug offense when: (1) he possesses the gun "in proximity to" the drugs; or (2) the firearm facilitates the drug offense.  *See United States v. Carillo-Ayala*, 713 F.3d 82, 96 (11th Cir. 2013).  We have held that "facilitation" also occurs for purposes of this enhancement when a drug dealer setting up a drug sale offers to sell a firearm at the same time, even if the drug dealer subsequently does not bring the firearm to the sale. *Jackson*, 997 F.3d at 1141.

Here, the district court did not clearly err by finding that the Hilliard possessed a firearm in connection with the heroin sale. The heroin and firearm sales were negotiated to occur at the same time on May 25.  Mitchell arrived at the location of the deal

expecting to get the heroin and the drugs at the same time. However, Hilliard sold Mitchell the firearm at one location, and then made Mitchell drive him to an area near the Rolling Ridge apartments, where Hilliard retrieved the heroin and then sold it to Mitchell. Thus, a sufficient connection between the gun and the drug sales existed to support the § 2K2.1(b)(6)(B) enhancement, and the district court did not clearly err in imposing it. *See id.* (upholding enhancement where dealer negotiated sale of drugs and a gun at the same time and the buyer showed up expecting to buy both, but the gun was not there).

### ii.    Substantive reasonableness

We review the substantive reasonableness of a sentence under a deferential abuse of discretion standard, asking whether the sentence is reasonable in light of the totality of the circumstances. *Gall v. United States*, 552 U.S. 38, 51 (2007). A district court "imposes a substantively unreasonable sentence only when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015) (quotations omitted). "A district court commits a clear error of judgment when it weighs the § 3553(a) sentencing factors unreasonably." *United States v. Butler*, 39 F.4th 1349, 1355 (11th Cir. 2022). The burden rests on the party challenging the sentence to show "that the sentence is unreasonable in light of the entire record, the § 3553(a) factors, and

the substantial deference afforded sentencing courts." *Rosales-Bruno*, 789 F.3d at 1256.

The district court must issue a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of § 3553(a)(2), which include the need for a sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, and protect the public from future criminal conduct. 18 U.S.C. § 3553(a)(2). In determining the appropriate sentence, the district court must also consider the "nature and circumstances of the offense and the history and characteristics of the defendant"; the guidelines range; the "kinds of sentences available"; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and "the need to provide restitution." *Id.* § 3553(a)(1), (3)–(4), (6)–(7). When evaluating the § 3553(a) factors, a court may properly consider information that is already accounted for in the guidelines. *See United States v. Williams*, 526 F.3d 1312, 1324 (11th Cir. 2008) (explaining that the district court could properly consider the defendant's criminal history as part of the § 3553(a) factors even though it was already "part of the calculation of his guideline range"); *see also United States v. Dougherty*, 754 F.3d 1353, 1361 (11th Cir. 2014) ("The district court may consider facts that were taken into account when formulating the guideline range for the sake of a variance.").

The weight given to a particular § 3553(a) factor "is committed to the sound discretion of the district court," and it need

not give "equal weight" to the § 3553(a) factors. *Rosales-Bruno*, 789 F.3d at 1254 (quotation omitted). "We will not second guess the weight given to a § 3553(a) factor so long as the sentence is reasonable under the circumstances." *Butler*, 39 F.4th at 1355.

"Upward variances are imposed based upon the § 3553(a) factors." *Id.* No presumption of reasonableness or unreasonableness applies to a sentence that lies outside the advisory guidelines range. *Id.* "When imposing a variance, a district judge must give serious consideration to the extent of any departure from the [g]uidelines and must explain her conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Id.* (alteration adopted) (quotations omitted). In reviewing the reasonableness of such a sentence, we "may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Gall*, 552 U.S. at 51.

We will "vacate the sentence if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (quotations omitted).

Here, the district court did not abuse its discretion in varying upward from the applicable guidelines range of 110 to 137 months' imprisonment and imposing a sentence of 192 months'

imprisonment.    The district court explained that an upward variance was appropriate because of the nature and circumstances of the offenses, and Hilliard's criminal history and personal characteristics.    Hilliard's argument that this information was already accounted for in the guidelines and that the district court placed too much weight on his criminal history is unpersuasive.  As noted previously, when evaluating the history and characteristics of the defendant, a court may properly consider information that is already accounted for by the guidelines.  *See Williams*, 526 F.3d at 1324; *Dougherty*, 754 F.3d at 1361.   Additionally, "[c]ourts have broad leeway in deciding how much weight to give to prior crimes the defendant has committed, and placing substantial weight on a defendant's criminal record is entirely consistent with § 3553(a) because five of the factors it requires a court to consider are related to criminal history." *United States v. Riley*, 995 F.3d 1272, 1279 (11th Cir. 2021) (alteration adopted) (quotations and citation omitted); *see also Butler*, 39 F.4th at 1355 (explaining that "a court may also impose an upward variance if it concludes that the [g]uidelines range was insufficient in light of a defendant's criminal history"). The district court acted within its discretion in giving more weight to certain sentencing factors over others and provided sufficient justifications for the variance.  *See Rosales-Bruno*, 789 F.3d at 1254. Although Hilliard quarrels with how the district court weighed the relevant § 3553(a) factors, "[w]e will not second guess the weight" the district court gave the § 3553(a) factors. *Butler*, 39 F.4th at 1355.

Finally, we note that Hilliard's 192-month sentence is well below the statutory maximum of 40 years' imprisonment, which is

another indicator of reasonableness. *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008) (explaining that a sentence that is below the statutory maximum is an indicator of reasonableness). Accordingly, we are not "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (quotations omitted). Consequently, we conclude that Hilliard's sentence is substantively reasonable, and we affirm.

**AFFIRMED.**